## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## (TAMPA DIVISION)

**JTH TAX, LLC d/b/a LIBERTY TAX SERVICE**,

      Plaintiff,

v.

**STEPHEN A. GILBERT and G-QTS INC.**,

      Defendants.

_____/

**Case No. 8:22-cv-00625-CEH-AEP**

## PLAINTIFF'S AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to this Court's order granting leave to file this Amended Motion (DE 18), Plaintiff JTH Tax, LLC d/b/a Liberty Tax Service ("Plaintiff" or "Liberty") respectfully moves under Fed. R. Civ. P. Rule 65 for a temporary restraining order and preliminary injunction against Defendants Stephen A. Gilbert and G-QTS Inc. ("Defendants").

## I.    SUMMARY OF ARGUMENT.

Liberty seeks injunctive relief to avoid irreparable harm that will occur if Defendants continue to flout their post-termination obligations under their Franchise Agreements and Lease Surrender Agreements with Liberty.   Until recently, the defendant G-QTS Inc. was the franchisee for six Liberty Tax Service® franchise territories ("Territories") under six separate franchise agreements (the "Franchise

1

Agreements"). The individual defendant, Mr. Gilbert, owns and controls G-QTS Inc., and personally agreed to perform all the obligations under the Franchise Agreements, including the covenants not to compete, covenants not to solicit, confidentiality obligations and post-termination obligations to assign leases to Liberty. Liberty terminated the Franchise Agreements on March 5, 2022 after it discovered that Defendants had been illegally allowing employees to share use of PTINs (preparer tax identification numbers). Defendants' illegal sharing of PTIN numbers violated federal law and breached the Franchise Agreements.

On March 5, 2022, as Liberty was in the process of terminating Defendants' Franchise Agreements, Liberty and the Defendants executed Lease Surrender Agreements with respect to four franchise office locations in Saint Petersburg and Tampa. The Lease Surrender Agreements are binding and enforceable, and consistent with the right that Liberty already had under the Franchise Agreements to take assignment of leases for the former franchise locations. After freely entering the Lease Surrender Agreements, however, Defendants (though counsel) alleged that the agreements are "unconscionable" and purported to rescind them.

Then – instead of cooperating to assign leases to Liberty as the Franchise Agreements and Lease Surrender Agreements require – Defendants changed the locks on at least two of the offices, locked Liberty employees out, communicated with landlords to obstruct Liberty's efforts to take assignment of the leases, and removed Liberty signs and replaced them with signs for a competing chain of tax preparation businesses. Defendants have also absconded with Liberty's confidential information,

client files, and equipment including computers and printers.

Defendants have continued to flout the post-termination obligations even after Liberty filed its original complaint in this action, including by installing signs for "Fast Tax" (a competing tax preparation business) and launching a competing business at the Liberty franchise locations in violation of Section 10(b) of the Liberty Franchise Agreements (which prohibit Defendants from operating a tax return preparation business within 25 miles of Liberty Franchise Territories for two years following termination of the Franchise Agreements).

Defendants conduct violates their obligations under the Franchise Agreements and Lease Surrender Agreements, and interferes with Liberty's ability to conduct business at the franchise locations during the busy tax season. Their actions have already interfered with Liberty's operations and, absent an injunction, will irreparably harm Liberty. Accordingly, Liberty seeks a temporary restraining order and preliminary injunction:

> A.   Enjoining Defendants from operating a tax preparation business at the former Franchise Locations until March 5, 2024;
>
> B.   Enjoining Defendants from operating competing tax return preparation businesses within 25 miles of their Liberty Franchise Territories until March 5, 2024;[1]
>
> C.   Ordering Defendants to assign the leases for each of the Franchise Locations to Liberty, and to refrain from interfering with Liberty's

---

[1] Throughout the time that G-QTS Inc. was a Liberty franchisee, Liberty allowed Mr. Gilbert to operate one tax preparation office outside of the Liberty system, even though it was within 25 miles of a Liberty franchise territory. Liberty does not seek to enjoin Mr. Gilbert from continuing to operate that particular office, which is located at 7606 N. Nebraska Ave., Tampa, FL 33804.

right to act as Defendants' lawful agent and attorney-in-fact for the purpose of taking necessary action to complete assignment of the leases;

D.   Enjoining Defendants from causing or attempting to cause locks to be changed at any Franchise Locations, and or removing property from any Franchise Locations;

E.   Enjoining Defendants from using any of Liberty's Confidential Information;

F.   Enjoining Defendants from diverting or attempting to divert any customer or business from Liberty or to solicit or endeavor to obtain the business of any person who shall have been a customer of the Franchise Locations for a period of two years;

G.   Enjoining Defendants from entering onto or otherwise interfering with the operation of Liberty's franchise locations;

H.   Ordering Defendants to return all Liberty Confidential Information including all Liberty client files;

I.   Ordering Defendants to return Liberty's equipment (including printers and computers) and other property removed from Liberty's franchise locations; and

J.   Ordering Defendants to provide Liberty with a key for any new locks installed by Defendants at Liberty's franchise locations.

## II.   PROCEDURAL BACKGROUND.

Liberty filed a Verified Complaint (DE 1) and a First Amended Verified Complaint ("FAVC") (DE 15) against Defendants seeking damages and injunctive relief for Defendants' breach of contract, violations of the Defend Trade Secrets Act, conversion, and unfair competition.

## III.   FACTUAL BACKGROUND.

### A.   Liberty's Franchise System.

Liberty is the franchisor of Liberty Tax Service® income tax preparation service centers located throughout the United States. FAVC, ¶ 14.   Liberty has spent substantial time and money advertising and promoting the distinctive and well-known Liberty Tax Service® tax preparation system, which sells income tax preparation and filing services and products to the public under Liberty's various trademarks.  *Id.* ¶ 15.  Liberty is one of the largest and most recognized tax preparation franchises in the United States.  *Id.* ¶ 17.

Pursuant to the franchise agreements, Liberty discloses certain confidential information and trade secrets, including Liberty's confidential Operations Manual, methods of operation of franchise, customer information and records, and marketing information, to franchisees.  *Id.* ¶ 16.  In return, Liberty requires that its franchisees agree that, upon expiration, termination, or nonrenewal of a franchise agreement, they will never use, disclose, or permit the use or disclosure of its confidential information. *Id.* ¶¶ 21-22.  Additionally, the franchisee agrees that upon termination, expiration, or nonrenewal of a franchise agreement, the former franchisee will stop using all literature and forms received, return all confidential information, and return all copies of its Operations Manual and any updates thereto.  *Id.* ¶ 28.

**B.**    **The Franchise Agreements.**

Defendant G-QTS Inc. entered into six franchise agreements with Liberty for territories located in the Tampa and Saint Petersburg areas.  FAVC, ¶ 20, Ex. A-F. Mr. Gilbert, as the individual signatory for G-QTS Inc., personally agreed to perform all the obligations under the Agreements, including without limitation all obligations related to the covenants not to compete, covenants not to solicit, and confidentiality obligations. *Id.*, Ex. A-F, § 27. The six Franchise Agreements contain substantively identical rights and obligations. *Id.*, Ex. A-F. In exchange for the right to operate a Liberty franchise to sell tax preparation services and Liberty's disclosure of its trade secrets, Defendants agreed:

- "To comply with all federal, state and local laws, regulations, ordinances and the like, and to be responsible for such compliance by all employees of the Franchised Businesses." (FAVC, Exs. A-F § 6(w));

- That "No person who prepares or supervises the preparation of federal tax returns at [Defendants'] Franchised Business shall be permitted to undertake such activities unless such person has an active PTIN." (*Id.* § 6(g));

- That if they breached Section 6(w)-(x) of the Franchise Agreement, then "Liberty may terminate this Agreement without notice and the opportunity to cure." (*Id.* § 8(b)(iii));

- Upon termination, expiration, or non-renewal ("termination"), to

  - assign to Liberty all phone numbers used in connection with the operation of the Franchised Businesses,
  - assign to Liberty any interest in any leases,
  - deliver to Liberty all customer lists, tax returns, files, and records,
  - return Liberty's confidential operations manual, and
  - adhere to the Franchise Agreements' post-termination non-competition and non-solicitation covenants (*Id.* § 9);

- Post-termination, "[f]or a period of two (2) years following the termination, expiration, transfer or other disposition of the Franchised Business . . . not to directly or indirectly, for a fee or charge, prepare or electronically file income tax returns . . . within the Territory or within a twenty-five miles of the boundaries of the Territory," (*Id.* § 10(b));

- Post-termination, "for a period of two (2) years following the… termination… of the Franchise Business… you will not within the Territory or within twenty-five (25) miles of the boundaries of the Territory, directly or indirectly, solicit the patronage of any person or entity served by any of your Liberty offices in the last twelve (12) months that you were a Liberty franchisee… for the purpose of offering such person or entity, for a fee or charge, income tax preparation, electronic filing of tax returns, or Financial Products." (*Id.* § 10(d));

- That "the provisions of Section 10 (i.e., the non-competition and non-solicitation covenants) are reasonable, valid and not contrary to the public interest" and that "Liberty is entitled to a temporary restraining order, preliminary and/or permanent injunction for any breach of duties under any of the non-monetary obligations of Sections 9 and 10. *(Id.* § 10(h)); and

- To refrain from using Liberty's trade secrets and confidential information following termination of the Franchise Agreement. (*Id.* § 12).

## C.   Defendants violated federal law and breached the Franchise Agreements by permitting shared used of a PTIN.

Based on an investigation Liberty determined that G-QTS Inc. was allowing one of its employees, Kesha Mooney, to prepare and file federal tax returns using Mr. Gilbert's own PTIN (preparer tax identification number). *See* FAVC, ¶¶ 38-39. When Liberty confronted Mr. Gilbert concerning these facts, he did not deny that Ms. Mooney had been preparing and filing returns using his PTIN. *Id.*, ¶ 38.

Shared use of PTIN numbers violates federal law. *See* 26 U.S.C. § 6109(a)(4) ("[e]ach filed return of tax or claim for refund of tax …prepared by one or more tax return preparers must include the [PTIN] of the tax return preparer."); 26 C.F.R. §

1.6109-2(a)(1) ("if there is an employment arrangement or association between the individual tax return preparer and another person...the identifying number of the other person must also appear on the filed return or claim for refund"). The IRS "requires paid return preparers to identify themselves on the returns they prepare for customers by including their [PTIN] ... on the return." *United States v. Espinal*, 2021 WL 3666323, *4 (S.D. Fla. Aug. 18, 2021). "Individuals who prepare [but] do not sign the returns are known as 'ghost preparers'" and the "IRS can assess penalties against return preparers who not comply with the [PTIN] requirements of 26 U.S.C. § 6109" in addition to seeking injunctive relief against the preparer. *Id.*[2]

Thus, G-QTS Inc. and Gilbert (who agreed to be bound individually under the Franchise Agreements) breached Section 6(xii) of each of the Franchise Agreements (prohibiting shared use of PTINs) and Section 6(w) (requiring compliance with federal law).  Upon Defendants' violations of federal law in breach of Sections 6(w)-(x), Liberty had the right to terminate G-QTS Inc. as a franchisee.  *See* FAVC, Exs. A-F, § 8(b)(iii).

---

[2] *See also* IRS guidance available at https://www.irs.gov/tax-professionals/frequently-asked-questions-do-i-need-a-ptin, which includes the following questions and answers:

**4. Can multiple individuals or one office share one PTIN?**
No, every individual who, for compensation, prepares or assists in the preparation of a tax return or claim for refund must have his or her own PTIN and each tax return preparer may only obtain one PTIN.

**5. If I don't have a PTIN, can I still prepare tax returns for compensation?**
No. You must have a PTIN to prepare tax returns for compensation.

**D.     Termination of the Franchise Agreements.**

On March 5, 2022, Liberty sent Defendants a letter terminating all six of Defendants' Franchise Agreements, effective immediately, because Defendants breached the Agreements and violated federal law by allowing shared use of a PTIN. *See* FAVC, ¶¶ 37-40, and Exhibit K.   In the March 5th Termination Letter, Liberty reminded Defendants of their obligations under the Franchise Agreements, including their obligations to:

- "Deliver to Liberty all paper and electronic copies of your customer lists, tax returns, files, and records; Deliver to Franchisor all customer tax returns, files, records, and all copies thereof;

- Deliver to Liberty the Operations Manual and all updates which Liberty loaned to you; Upon Liberty's request, assign any interest you have in any lease, sublease or any other agreement related to the Franchised Business; …

- Cease using and forever refrain from using and disclosing Liberty's confidential information and trade secrets; [and]

- Adhere to the provisions of the post-termination covenants not to compete and not to solicit in the Franchise Agreements …

*Id.*, ¶ 40.

**E.     Lease Surrender Agreements and Liberty's right to take assignment of leases under Franchise Agreements.**

On March 5, 2022, Liberty and the Defendants executed Lease Surrender Agreements with respect to the franchise office locations located at (a) 2156 34th St S, Saint Petersburg, FL 33711; (b) 3713 49th St. N, Saint Petersburg, FL 33710; (c) 7075 W. Waters Ave., Tampa, FL 33634; and (d) 13803 W. Hillsborough Ave., Tampa, FL

33635.  *See* FAVC, ¶ 41, Ex. G-J.

The Lease Surrender Agreements provided that Defendants "desire[] to surrender the Lease to [Liberty] and [Liberty] is willing to accept the surrender…" *See* FAVC, Ex. G-J. In the Lease Surrender Agreements, Defendants agreed that, "as of March 5, 2022" Defendants "assign[ed]…the Lease, the Premises and all rights to the Premises granted to [Defendants] pursuant to the Lease…" *Id.*, § 1.  Defendants further agreed that "[r]egardless of the forms and documents that may have been signed by [Defendants] under this provision, [Defendants] hereby irrevocably grant[] Liberty full power and authority for the sole purpose of taking any necessary action to complete the transfers required pursuant to this section…" *Id.*, § 2.

Independently of the Lease Surrender Agreements, Liberty also has the right to take assignment of the leases under the Franchise Agreement.  Specifically, in Section 9(f) of the Franchise Agreements, Defendants agreed upon termination to "assign to Liberty…any interest [Defendants] have in any lease, sublease or any other agreement related to the Franchised Business." *See* FAVC, Ex. A-F, § 9(f). Defendants further agreed to "irrevocably appoint[] Liberty as [Defendants'] true and lawful agent and attorney-in-fact with full power and authority for the sole purpose of taking any necessary action to complete the assignments required pursuant to this section…" *Id.*, § 9(f).

**F.    Defendants' interference with assignment of leases to Liberty.**

Since termination of the Franchise Agreements and the execution of the Lease Surrender Agreements, Defendants have failed to execute documents necessary to

assign leases to Liberty. *Id.*, ¶ 60. Instead, Defendants have alleged that the Lease Surrender Agreements are "unconscionable," purported to rescind them, and demanded that Liberty return possession of the franchise office locations. *See* FAVC, ¶ 61 and Ex. L.  Relying upon Defendants' purported rescission, Defendants have taken steps to directly interfere with the assignment of leases to Liberty. *Id.*, ¶ 62.

On March 15, 2022, Defendants, through counsel, contacted the landlord for the Liberty location at 3713 49th Street N, St. Petersburg, FL, stating that the Lease Surrender Agreement for the location was rescinded, and requesting that possession of the location be restored to Defendants. *Id.*, ¶ 63 and Ex. M. Defendants subsequently contacted the landlord for the Liberty location at 3713 49th Street N, St. Petersburg, FL requesting a copy of the key for the location. *Id.*, ¶ 64. As a result of Defendants actions, the landlord for the Liberty location at location at 3713 49th Street N, St. Petersburg, FL has denied that it is obligated to provide a key to Liberty and denied that it has consented to the change in possession of the location to Liberty. *Id.*, ¶ 65.

On March 16, 2022, Gilbert brought a locksmith to the premises at both 2156 34th St S, Saint Petersburg, FL 33711and 3713 49th St. N, Saint Petersburg, FL 33710 and changed the locks at both locations. *Id.*, ¶ 47. While changing the locks at the Liberty locations on March 16, 2022, Gilbert also communicated with potential customers of Liberty. Specifically, Gilbert informed at least one potential Liberty customer that the Liberty office location could not provide services "today". On March 17, 2022, Defendants' counsel informed Plaintiff's counsel that Defendants

seeks to continue tax preparation services out of the Franchise Locations. *Id.*, ¶ 48.

In changing the locks for the Liberty location at 3713 49th St. N, Saint Petersburg, FL 33710, Gilbert did not provide Liberty employees at the office with a new key. As a result, Liberty personnel cannot exit and reenter the premises at 3713 49th St. N, Saint Petersburg, FL 33710. *Id.*, ¶ 49.  Similarly, in changing the locks for the Liberty location at 2156 34th St S, Saint Petersburg, FL 33711 Gilbert initially provided Liberty employees at the office with a new key. *Id.*, ¶ 50. After providing a key to Liberty employees at 2156 34th St S, Saint Petersburg FL 33711, Gilbert remained at the office location and told Liberty employees at the office location to leave. *Id.*, ¶ 51. Gilbert later demanded that the Liberty employees at the office location at 2156 34th St S, Saint Petersburg FL 33711 return the key to Gilbert. *Id.*, ¶ 52. Gilbert's actions in changing the locks and removing Liberty equipment, are interfering with Liberty's ability to conduct business at the two Liberty locations during the busy tax season. *Id.*, ¶ 53.

In sum, Defendants are interfering with Liberty's power of attorney to effectuate assignment of the leases through Defendants' counsel's communications with landlords, and by changing locks, communicating with customers, removing equipment, and purporting to rescind the Lease Surrender Agreements. *Id.*, ¶ 66.

## G.   Defendants' unlawful competition against Liberty at former Franchise Locations.

After Liberty filed its original Verified Complaint (on March 17, 2022) and its Emergency Motion for Temporary Restraining Order (on March 18, 2022),

Defendants removed Liberty signs at two Liberty franchise locations in Saint Petersburg and installed signs for "Fast Tax" (a competing tax preparation business) at those locations, and are now operating a competing business at the Liberty franchise locations. *See* FAVC at ¶¶ 4, 67-69. Defendants' new conduct violates Section 10(b) of the Liberty Franchise Agreements, which prohibit Defendants from operating a tax return preparation business within 25 miles of Liberty Franchise Territories for two years following termination of the Franchise Agreements. *Id.*, ¶ 30 and Exs. A-F.

### H. Defendants' misappropriation of Liberty's confidential information and equipment.

Following termination of the Franchise Agreements, Defendants failed to return to Liberty, and instead absconded with, client files and Liberty's other confidential information including at least portions of Liberty's confidential Operations Manual, and other property including computers and printers. FAVC, ¶ 70.

On or about March 15, 2022, at Gilbert's direction, enlisted a former tax preparer, Kesha Mooney, a former tax preparer at the Franchise Locations, entered the office at 2156 34th St S, Saint Petersburg, FL 33711, and removed two printers from the location. *Id.*, ¶ 44. Ms. Mooney told a Liberty employee who witnessed her removing the printers that Gilbert instructed her to retrieve the printers from the Liberty location. *Id.*, ¶ 45. Under the Lease Surrender Agreement, Liberty owned the printers that Ms. Mooney removed at Gilbert's direction. *Id.*, ¶ 46, and Ex. H.

On information and belief, Defendants are currently and will continue to offer electronic filing of tax returns at their competing business location, and use Liberty's trade secrets in violation of Defendants' non-compete and non-solicit covenants under the respective Franchise Agreements. *Id.* ¶ 71.

## IV.   ARGUMENT.

To obtain a temporary restraining order or preliminary injunction, Plaintiff must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (quotation omitted); *eCapital Commercial Financing Corp. v. Hitachi Capital America Corp.*, 519 F.Supp.3d 1129, 1133 (S.D. Fla. 2021).  "The goal of a preliminary injunction is to 'protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits.'" *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014) (quoting *Long v. Benson*, 383 Fed.Appx. 930, 931 (11th Cir.2010)). Liberty has readily satisfied each element entitling it to equitable relief.

**A.     Liberty has a substantial likelihood of success on the merits.**

    **1.   Liberty is likely to prevail on its claims for breach of the Franchise Agreements.**

"Virginia law governs all claims that in any way relate to or arise out of [the Franchise Agreements] or any of the dealings of the parties hereto."  FAVC, Exs. A-F, §17(b).   A breach of contract claim under Virginia law requires: (1) a legally enforceable obligation; (2) violation or breach of that obligation; and (3) injury or damage caused by the breach of that obligation.  *Filak v. George*, 267 Va. 612, 619 (2004).

    **(a)    The Franchise Agreements are valid and enforceable.**

The post-termination obligations under Liberty's franchise agreements are narrowly tailored and necessary to protect Liberty's goodwill and reputation.  Courts have repeatedly enforced Liberty's non-compete and other post-termination obligations as reasonable restraints of trade. *See, e.g., JTH Tax, Inc. v. Frashier*, 2009 WL 10689306 (E.D. Va. Apr. 15, 2009); *JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818 (E.D. Va. 2007); *JTH Tax, Inc. v. Donofrio*, Civil Action No. 2:06cv47, 2006 WL 2796841 (E.D. Va. Sep. 26, 2006); *JTH Tax, Inc. v. Abikarram*, Case No. 19-CV-60328-UNGARO-HUNT, 2019 WL 2254816, at *2-5 (S.D. Fla. Mar. 22, 2019); *JTH Tax LLC v. Da Silva*, Case No. 8:20-CV-00288-MSS-AEP, 2020 WL 3266568, at *2 (M.D. Fla. Mar. 11, 2020); *JTH Tax LLC v. McHugh*, Case No. C20-329RSM, 2020 WL 1689731, at *4 (W.D. Wash. Apr. 7, 2020); *JTH Tax, Inc. v. Magnotte*, Case No. 19-cv-11607, 2020 WL 4284056 (E.D. Mich. July 27, 2020); *JTH Tax LLC v. Kelly*, Case No.

3:20-cv-05484-RJB, 2020 WL 6504979, at *4 (W.D. Wash. Aug. 19, 2020).

For example, in *JTH Tax, Inc. v. Frashier*, 2009 WL 10689306 (E.D. Va. Apr. 15, 2009), the Eastern District of Virginia held that the non-compete provision in Liberty's franchise agreement is reasonable because "the scope is limited in terms of duration (two years); geography (twenty-five miles of Defendant's previous territory); and function (tax preparation)." *Id.* at *3.[3] "These conditions, to which Defendant agreed, do not unduly hamper Defendant's ability to earn a living, and they are not more restrictive than necessary to protect Plaintiff's business interests." *Id.*

In the Franchise Agreements themselves, Mr. Gilbert agreed that the non-competition and non-solicitation covenants are "reasonable, valid and not contrary to the public interest" and he "waive[d] all defenses to the strict enforcement of [those provisions]." FAVC, Exs. A-F § 10(h). *See also JTH Tax LLC v. Silva*, No. 820CV00288MSSAEP, 2020 WL 3266568, at *1 (M.D. Fla. Mar. 11, 2020) (entering temporary restraining order against former Liberty franchisee and noting that

---

[3] As the *Frashier* court explained, under Virginia law, "to be enforceable, [a non-competition] restraint must not be (1) more restrictive than necessary to protect a business interest; (2) 'unduly harsh or oppressive' in restricting one's ability to earn a livelihood; or (3) offensive to public policy." *Frashier*, 2009 WL 10689306, at *3 (citation omitted). "In the franchise context, Virginia courts analogize non-compete clauses to those in the 'sale of business' context." *Id.* at *2 (citing *Brenco Enters., Inc. v. Takeout Taxi Franchising Sys., Inc.*, 2003 WL 21659422, at *52-59 (Va. Cir. Ct. May 2, 2003) (determining that the standard of review applicable to non-compete provisions in a franchise context is the "lesser standard applied in analyzing covenants accompanying the sale of a business.") "Courts give greater deference to non-compete restraints between a buyer and a seller than to those between an employer and an employee." *Id.* (citations omitted).

16

defendant had agreed Liberty would be entitled to injunctive relief if he breached restrictive covenants).

> **(b)**      **Defendants are breaching their post-termination obligations under the Franchise Agreements.**

As detailed above, Defendants have breached and continue to breach their obligations under the Franchise Agreements, in at least three ways: (i) by competing against Liberty at the former franchise locations; (ii) by interfering with Liberty's right to take assignment of leases for the former franchise locations; and (iii) by failing to return Liberty's confidential information, clients files and other property including computers and printers.

First, post-termination, Defendants were prohibited from:  (1) directly or indirectly competing with Liberty by electronically filing income tax returns of offering Financial Products within 25 miles of the Franchise Territories during the two years following termination, or (2) directly or indirectly soliciting customers that the Franchised Businesses had served within the 12 months preceding termination for the purpose of offering income tax preparation and filing or Financial Products within 25 miles of the Territories during the two years following termination.  *See* FAVC, Ex. A-F, §§ 9(k), 10(b), 10(d).  Defendants have breached these provisions by launching competing tax preparation businesses at the former franchise locations.  *See* FAVC, ¶¶ 67-69. *See*, *e.g.*, *JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 823 (E.D. Va. 2007) (holding that Liberty presented "voluminous evidence" of breach at preliminary injunction stage where Liberty validly terminated franchise agreement and former franchisee

17

opened competing tax preparation businesses at three former franchise locations).

Defendants' unlawful competition against Liberty has damaged Liberty, including loss of customer goodwill and loyalty; loss of business opportunities and relationships to provide tax preparation services and related services; loss of customers; loss of profits; loss of franchisee stability; loss of ability to sell other franchises; and loss of competitive advantage in each of the Franchise Territories. *Id.*, ¶ 81.

Second, in Section 9(f) of the Franchise Agreements, Defendants agreed upon termination to "assign to Liberty…any interest [Defendants] have in any lease, sublease or any other agreement related to the Franchised Business." *Id.*, § 9(f). Defendants further agreed that "[r]egardless of the forms and documents that may have been signed by [Defendants] under this provision, [Defendants] hereby irrevocably appoints Liberty as [Defendants'] true and lawful agent and attorney-in-fact- with full power and authority for the sole purpose of taking any necessary action to complete the assignments required pursuant to this section…" *Id.*, § 9(f). Defendants have breached their obligation to assign the leases as the Franchise Agreements require. *See* FAVC, ¶ 60. *See also JTH Tax, Inc. v. Aime*, No. 2:16CV279, 2016 WL 4182743, at *5 (E.D. Va. Aug. 3, 2016) (entering mandatory injunction requiring former Liberty franchisee to assign leases for franchise locations where defendant had changed locks and launched competing business); *JTH Tax, Inc. v. Sawhney*, No. 19-CV-4035 (AJN), 2019 WL 3051760, at *7 (S.D.N.Y. July 11, 2019) (entering temporary restraining order requiring former Liberty franchisee to assign leases for franchise locations in accordance with Section 9(f) of Liberty franchise

agreements).

Third, Defendants also breached the Franchise Agreements by failing to return to Liberty, and instead absconding with, Liberty's confidential information, client files and equipment including computers and printers.  *Id.*, ¶ 70.  The failure to return such confidential information and clients files upon termination violates Section 9(g)-(i) of the Franchise Agreements.  *See* FAVC, Ex. A-F, § 9(g)-(i).  *See also JTH Tax, Inc. v. Magnotte*, 2020 WL 4284056, at *4 (E.D. Mich. July 27, 2020) (noting that former franchisees breached post-termination obligations under franchise agreements to return confidential information to Liberty).  For all of these reasons, Liberty is likely to prevail on its claim against Defendants for breach of the Franchise Agreements.

## 2.  Liberty is likely to prevail on its Defend Trade Secrets Act claim.

"To state a claim under the DTSA, a plaintiff must allege that it (i) possessed information of independent economic value that (a) was lawfully owned by the plaintiff and (b) for which the plaintiff took reasonable measures to keep secret, and (ii) the defendant used and/or disclosed that information, despite (iii) a duty to maintain its secrecy." *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1293 (S.D. Fla. 2018) (internal quotation marks and citations omitted).  *See* 18 U.S.C. § 1839(5).  The DTSA defines trade secrets broadly as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

*Future Metals LLC v. Ruggiero*, 2021 WL 1701568, at *17 (S.D. Fla. Apr. 13, 2021),

*report and recommendation adopted*, 2021 WL 1699877 (S.D. Fla. Apr. 28, 2021).

The Franchise Agreements identify the confidential information Liberty treats as trade secrets, and which franchisees also must maintain in confidence:  customer information (e.g., customer names, addresses, e-mail addresses, phone numbers, tax returns, files, and records) and methods of operation (e.g., Operations Manual). FAVC, Exs. A-F §§ 9(g)-(i); 12(a).   Liberty has taken steps to preserve the confidentiality of its information including, but not limited to, the fact that Liberty limits the disclosure of its trade secrets to franchisees who execute a franchise agreement and limits the use of such trade secrets to the term of the franchise agreement and solely for the purpose of operating a Franchised Business pursuant to a franchise agreement.  *Id.* §§ 9(g)-(i); 12(a), (c); FAVC, ¶¶ 111-114.

Following termination of the Franchise Agreements, Defendants were required to return Liberty's confidential information. Defendants however failed to do so, and instead absconded with, client files and Liberty's other confidential information including at least portions of Liberty's confidential Operations Manual.  FAVC, ¶ 70. Upon information and belief, Defendants are currently and will continue to offer

electronic filing of tax returns at their competing business location, and use Liberty's trade secrets in violation of Defendants' non-compete and non-solicit covenants under the respective Franchise Agreements, and in violation of DTSA. *Id.*, ¶ 71.

### B. Liberty will suffer irreparable injury unless an injunction issues.

"To demonstrate irreparable harm, a movant must show 'that the injury cannot be undone through monetary remedies.'" *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1223 (S.D. Fla. 2014) (quoting *Anago Franchising, Inc. v. C.H.M.I., Inc.*, 2009 WL 5176548, at *11 (S.D. Fla. Dec. 21, 2009)). "The irreparable injury claimed "must be neither remote nor speculative, but actual and imminent." *Id.* (citation omitted). "When the failure to grant injunctive relief creates the possibility of a permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong has been satisfied." *New Horizons Computer Learning Centers, Inc. v. Silicon Valley Training Partners, Inc.*, No. 2:02CV459FTM29SPC, 2003 WL 23654790, at *7 (M.D. Fla. Nov. 12, 2003) (citation omitted). "The Eleventh Circuit deems injunctions the normal and favored remedy for violations of restrictive covenants because monetary damages are typically quite difficult to establish and often cannot adequately compensate for that type of breach." *R.J. Gators Franchise Sys., Inc. v. MBC Restaurants, Inc.*, No. 2:05CV00494 VMCDNF, 2005 WL 4655379, at *5 (M.D. Fla. Nov. 6, 2005) (citing *Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1448–1449 (11th Cir.1991)). *See also JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 825 (E.D. Va. 2007) (enjoining former Liberty franchisee from breaching non-compete to prevent

irreparable injury based on "high likelihood of permanent loss of former and potential customers"); *JTH Tax, Inc. v. Abikarram*, 2019 WL 2254816, *4 ("the loss of customers and goodwill is an irreparable injury."); *JTH Tax, Inc. v. Donofrio*, No. 2:06cv47, 2006 WL 2796841, at *14 (E.D. Va. Sept. 26, 2006) ("[W]hen failure to grant injunctive relief creates the possibility of permanent loss of customers to a competitor or the loss of good-will, the irreparable harm prong is satisfied."); *JTH Tax, Inc. v. Geraci*, No. 2:14-CV-236, 2014 WL 4955373, at *8 (E.D. Va. Oct. 2, 2014) (finding irreparable harm where "[n]o amount of damages can quantify the potential loss to Liberty's goodwill and its reputation, and failure to enforce the non-compete could send a dangerously damaging signal to other franchisees.").

Defendants' breach of the post-termination non-compete covenants will cause Liberty irreparable harm including loss of customer goodwill and loyalty; loss of business opportunities and relationships to provide tax preparation services and related services; loss of customers; loss of profits; loss of franchisee stability; loss of ability to sell other franchises; and loss of competitive advantage in each of the Franchise Territories. FAVC, ¶ 81.  Monetary damages are an insufficient remedy because Liberty can only potentially quantify a limited loss of customers, but cannot take into account the continuing irreparable damage to the value of Liberty's Confidential Information, goodwill, customer loyalty, and its ability to sell franchises, all of which result from Defendants' ongoing violations. *Id.*, ¶ 82.

With regard to irreparable harm, this case is like *U.S. Lawns, Inc. v. Landscape Concepts of CT, LLC*, No. 616CV929ORL41DAB, 2016 WL 9526340, (M.D. Fla. Oct.

31, 2016), where the franchisee of a landscaping company started competing against plaintiff in the former franchise territory. "This unwarranted competition from Defendants who continue to serve previous [franchise] customers seriously diminishes Plaintiff's ability to successfully refranchise the [franchise] territory and salvage its business there." *Id.* at *9.

Here, as in *U.S. Lawns*, "Plaintiff has established that without an injunction, its franchise system, including the strength of its system, its relationship with its other franchisees and customers, its goodwill, and its ability to enforce its restrictive noncompetition covenants—which are crucial to the operation of Plaintiff's franchise—will be harmed." *Id. See also R.J. Gators Franchise Sys., Inc. v. MBC Restaurants, Inc.*, 2005 WL 4655379, at 5 (M.D. Fla. 2005) (entering injunction in favor of franchisor that otherwise would "be effectively unable to re-enter the market formerly serviced by defendant's franchise, causing Plaintiff to lose sales, goodwill, and the market presence it enjoys in the [franchise] area"); *Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*, 312 F. Supp. 3d 1325, 1338 (S.D. Fla. 2018) ("[Franchisor's] interest in re-entering the market and its efforts to bolster the goodwill associated with [franchised business] in the [franchise territory] are sufficient to establish its legitimate business interest in enforcing the Non–Compete Provision"); *JTH Tax LLC v. Da Silva*, Case No. 8:20-CV-00288-MSS-AEP, 2020 WL 3266568, at *2 (M.D. Fla. Mar. 11, 2020) (TRO prohibiting former Liberty  franchisee from competing in violation of non-compete provision in franchise agreement).

Defendants' failure to assign the leases to Liberty, and subsequent blocking of Liberty's access to Liberty franchise locations, also will irreparably harm Liberty.  *See also JTH Tax, Inc. v. Aime*, No. 2:16CV279, 2016 WL 4182743, at *5 (E.D. Va. Aug. 3, 2016) (finding "urgent" risk of irreparable harm where former Liberty franchisee failed to assign leases for franchise locations and instead changed locks and launched competing business); *JTH Tax, Inc. v. Sawhney*, No. 19-CV-4035 (AJN), 2019 WL 3051760, at *7 (S.D.N.Y. July 11, 2019) (entering temporary restraining order requiring former Liberty franchisee to assign leases).

Defendants have interfered with Liberty's ability to operate at the franchise locations in the midst of the busy tax season.  Defendants' conduct in changing locks, communicating with customers, removing equipment, and purporting to rescind the Lease Surrender Agreements interferes with Liberty's ability to operate at the Liberty franchise locations. *Id.*, ¶ 66. Such interference threatens Liberty's goodwill, reputation and relationship with its customers.  Goodwill has been described as the "expectancy of continued patronage[.]" *Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F.App'x 43, 45 (2d Cir. Mar. 19, 2012).  *See also Nat'l Elevator Cab & Door Co. v. H & B, Inc.,* 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (noting that good will "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business"), *aff'd*, 282 F.App'x 885 (2d Cir. June 27, 2008); *see id*. ("[G]ood will constitutes the intangible qualities of a business that attract customers . . . .").

For all these reasons, Liberty will be irreparably harmed in the absence of an injunction.

## C.    The threatened injury to Liberty outweighs any damage to Defendants.

"Generally, a franchisee that has breached the terms of its franchise agreement cannot then complain of harm from an injunction preventing further violations of the agreement." *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014) (citing *Dunkin' Donuts Franchised Restaurants LLC v. D & D Donuts, Inc.*, 566 F.Supp.2d 1350, 1361 (M.D. Fla. 2008)).   Any alleged harm to Defendants is solely self-inflicted and cannot outweigh the irreparable harm they would cause to Liberty's franchise business and customer relationships. *See U.S. Lawns*, 2016 WL 9526340, at *9 ("While the Court acknowledges that Defendants will suffer substantial financial losses if a preliminary injunction issues, the resulting harm follows from Defendants' failure to abide by the Non–Competition Clause in the Franchise Agreement"); *Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1297 (S.D. Fla. 2020) ("the Court must balance the relative hardship to each side. But the Court need not consider the 'hardship' to a defendant whose conduct is 'unlawful.'"); *MediaOne of Delaware, Inc. v. E & A Beepers & Cellulars*, 43 F. Supp. 2d 1348, 1354 (S.D. Fla. 1998) (a defendant suffers no hardship when an injunction "will merely enjoin [the defendant] from conducting a business which is already prohibited by state and federal law").

By failing to comply with their post-terminations under the Franchise Agreement, and interfering with Liberty's operations at the franchise locations,

Defendants proceeded at their own peril. The injunctive relief Liberty seeks will only enjoin Defendants from engaging in activities from which they are contractually barred.

### D.    An injunction is in the public interest.

Liberty's requested injunctive relief will enforce a valid, binding agreement that is reasonable in scope and necessary to prevent irreparable harm to its franchise business. "The public interest will not be disserved by the entry of a preliminary injunction. On the contrary, there is a benefit to the enforcement of a valid covenant not to compete and encouraging people to adhere to contractual obligations." *R.J. Gators Franchise Sys., Inc. v. MBC Restaurants, Inc.*, No. 2:05CV00494 VMCDNF, 2005 WL 4655379, at *5 (M.D. Fla. Nov. 6, 2005) (citation omitted). *See also Future Metals LLC v. Ruggiero*, 2021 WL 1701568, at *20 (S.D. Fla. Apr. 13, 2021), report and recommendation adopted, No. 21-CV-60114-RAR, 2021 WL 1699877 (S.D. Fla. Apr. 28, 2021) ("The public has a significant interest in safeguarding businesses from misappropriation of trade secrets by employees."); *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1363 (S.D. Fla. 2012) ("a preliminary injunction would affirmatively serve the public interest by protecting businesses from employees who misappropriate their trade secrets."); *JTH Tax, Inc. v. Abikarram*, 2019 WL 2254816, * 4 (entering injunction and recognizing that "protection of franchise-related rights is without question in the public interest").

Here, Defendants contractually agreed to assign the leases to Liberty, return Liberty's confidential information, and not to compete against Liberty within the

former franchise territories.   The public interest is served by enforcing those agreements by enjoining Defendants from further breaching the Franchise Agreements.

### E.   The Court should not require Liberty to post a bond under Fed. R. Civ. P. Rule 65(c), or alternatively should require a bond of $10,000 or less.

Liberty respectfully requests that the Court enter a preliminary injunction without a bond, or a nominal bond if any.  Fed. R. Civ. P. 65(c), generally requires a moving party to post a bond when a court issues a preliminary injunction, but "the amount of security required by the rule is a matter within the discretion of the trial court and the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (quotation omitted).

"The bond requirement of Rule 65(c) is appropriately waived in certain circumstances," "especially [when] the purpose of the Motion is to maintain the status quo." *Suntrust Equipment Finance & Leasing, Corp. v. Beliveau*, No. 8:12-CV-270-T-33MAP, 2012 WL 394996, at *1 (M.D. Fla. Feb. 7, 2012) (citation omitted). "The burden of establishing a rational basis for the amount of a proposed bond rests with the party seeking security." *Medi–Weightloss Franchising USA, LLC v. Las Colinas Medi Weightloss Clinics, LLC*, No. 8:13-CV-990-T-23TBM, 2013 WL 12122070, at *13 (M.D. Fla. Sept. 4, 2013) (citation omitted). *See also Tancogne v. Tomjai Enterprises Corp.*, 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005) ("This Court has the discretion to issue a preliminary injunction without requiring Plaintiffs to give security, notwithstanding

the seemingly mandatory language of the rule.") (citations omitted); *Johnston v. Tampa Sports Auth.*, 8:05-cv-2191-T-27MAP, 2006 WL 2970431, at *1 (M.D. Fla. Oct. 16, 2006) ("The Court recognizes that it maintains broad discretion to determine the amount of security and may, if appropriate, waive the security"); *TracFone Wireless, Inc. v. Washington*, 978 F. Supp. 2d 1225, 1235 (M.D. Fla. 2013) (waiving bond requirement where plaintiff had high probability of success on Lanham Act claims and defendants had "no legitimate interest" in continuing their unlawful conduct).

The verified facts warrant waiving the bond requirement in this case, or requiring Liberty to post only nominal security.  The potential for damage to Defendants from an injunction is limited.  Defendants have no right to engage in the unlawful conduct that is the subject of this motion, so they have no legitimate interests which a bond would be appropriate to secure.  *Cf. TracFone*, *supra*.

Also, Defendants expressly agreed in the Franchise Agreements to waive the bond requirement. FAVC, Exs. A-F § 10(g).  Liberty acknowledges that the Court is not bound by the parties' agreement to waive bond, but the Defendants' agreement to do so is an appropriate consideration, as another Judge in this District recently recognized.  *See JTH Tax LLC v. Silva*, No. 820CV00288MSSAEP, 2020 WL 3266568, at *3 (M.D. Fla. Mar. 11, 2020) ("because the Parties have waived 'any requirement that Liberty post a bond related to any temporary restraining order or injunction requested as a result of an alleged violation of Sections 9 and 10 [of the Franchise Agreement],' [] and because no significant financial constraints are imposed by this TRO, no bond shall be required to be posted by Plaintiff").  *See also JTH Tax, Inc. v.*

28

*Abikarram*, No. 0:19-CV-60328-UU, 2019 WL 3416995, at *4 (S.D. Fla. Feb. 26, 2019)

("Because Mr. Abikarram and ITPC agreed to waive the bond requirement pursuant

to Section 10(g) of the Franchise Agreements, and in the exercise of the Court's

discretion, Plaintiffs are not required to post a bond pursuant to Fed. R. Civ. P.

65(c)."); *Bemer USA, LLC v. Gasich*, No. 8:21-CV-948-VMC-TGW, 2021 WL 2459955,

at *2 (M.D. Fla. Apr. 22, 2021) ("The Court finds that a nominal bond is proper,

especially given that Gasich and Benloucif had contractually waived the bond

requirement. Thus, Bemer shall immediately file a bond in the amount of $500.00,

which amount the Court finds will adequately protect the interests of Defendants.");

*Tri-Cty. Mobile Wash, Inc. v. B&C Wash Corp.*, No. 21-60351-CIV, 2021 WL 6144645,

at *2 (S.D. Fla. Feb. 17, 2021) ("In the Court's sound discretion and because

Defendants agreed to waive the bond requirement, Plaintiff is not required to post a

bond pursuant to Fed. R. Civ. P. 65(c).").

Alternatively, the Court should require a bond of $10,000 or less, which is

sufficient in cases involving franchisees or employees breaching non-compete

obligations.  *See*, *e.g.*, *Medi-Weightloss Franchising USA, LLC v. Sadek*, No. 8:09-CV-

2421-T-24MAP, 2010 WL 1837767, at *8 (M.D. Fla. Mar. 11, 2010) (recommending

a $10,000 bond); *Wine Not, Int'l v. 2atec, LLC*, 8:06–cv–117–T–23, 2006 WL 1766508,

at *15 (M.D. Fla. June 26, 2006) (ordering an $11,000 bond); *R.J. Gators Franchise Sys.,*

*Inc. v. MBC Rests., Inc.*, 2:05–cv–00494–VMC–DNF, 2005 WL 4655379, at *5 (M.D.

Fla. Nov. 9, 2005) (finding $11,000 bond sufficient); *Stoneworks Inc. v. Empire Marble &*

*Granite Inc.*, No. 98-2017-CIV, 1998 WL 998962, at *7 (S.D. Fla. Nov. 20, 1998)

(ordering $5,000 bond where former employee left employment with plaintiff to work for competitor).

## VI.   CONCLUSION.

For the reasons set forth above, Liberty respectfully requests that the Court enter a temporary restraining order and preliminary injunction against Defendants, and require that Liberty post no bond or, alternatively, a bond of $10,000 or less.  With the Court's leave (DE 18), Liberty submits a proposed order with this Amended Motion.

Dated: March 28, 2022

Respectfully submitted,

*s/ Andrew R. Schindler*
FBN 124845
*aschindler@grsm.com*
**GORDON REES SCULLY MANSUKHANI, LLP**
100 SE 2nd Street, Suite 3900
Miami, Florida 33131
T: (305) 428-5329

**James Messenger, Esq.**
*Admitted Pro Hac Vice*
**GORDON REES SCULLY MANSUKHANI, LLP**
21 Custom House Street, Fifth Floor
Boston, MA 02110
T: (857) 263-2000
*jmessenger@grsm.com*

**Peter G. Siachos**
*Admitted Pro Hac Vice*
**GORDON REES SCULLY MANSUKHANI, LLP**
One Battery Park Plaza, 28th Floor
New York, NY  10004

T: (646) 808-6358
*psiachos@grsm.com*
**Attorneys for Plaintiff JTH Tax LLC d/b/a Liberty Tax Service**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document will be served on counsel for the defendants, Jeffrey M. Goldstein Goldstein Law Firm, PLLC Washington, DC, via email at jgoldstein@goldlawgroup.com.

*s/ Andrew R. Schindler*