UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JTH TAX, LLC d/b/a
LIBERTY TAX SERVICE,

        Plaintiff,

v.                                Case No. 8:22-cv-625-CEH-AEP

STEPHEN A. GILBERT and
G-QTS, INC.,

        Defendants.
_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff JTH Tax, LLC d/b/a Liberty Tax Service ("Liberty") brought this action against Defendants Stephen A. Gilbert ("Gilbert") and G-QTS, Inc. (collectively, "Defendants") alleging claims for breach of the franchise agreements (Counts I and II), common law conversion (Count III), violation of the Defend Trade Secrets Act of 2016 (DTSA) (Count IV), unfair competition (Count V), and a request for a declaratory judgement (Counts VI) and therefore seeking injunctive, monetary, and declarative relief (Doc. 1).  Contemporaneously with the filing of its Verified Complaint, Liberty moved for entry of a temporary restraining order against Defendants on an emergency basis (Doc. 11).  Upon review, the District Judge deferred ruling on Liberty's request for a temporary restraining order pending supplemental briefing on the amount of security (Doc. 13).  Liberty then submitted a Verified Amended Complaint and a request for supplemental briefing and a

consolidated hearing on its request for a temporary restraining order and preliminary injunction (Docs. 15 & 16). Thereafter, the District Judge denied the request for a temporary restraining order as moot, given the filing of the Verified Amended Complaint and granted in part and denied in part Liberty's request for supplemental briefing and a consolidated hearing, allowing Liberty to submit an amended motion seeking injunctive relief and to submit supplemental briefing in support (Doc. 18). By the instant motion, therefore, Liberty seeks entry of a preliminary injunction enjoining Defendants from competing against Liberty in violation of the franchise agreements and to assign leases and return confidential information to Liberty (Doc. 19). Defendants oppose Liberty's request, arguing, among other things, that Liberty cannot demonstrate a likelihood of success on the merits of its claims, Liberty will not suffer any irreparable harm, the harm that Defendants will suffer if a preliminary injunction issues exceeds any harm that Liberty will experience if a preliminary injunction is denied, and the public interest will not be served by entry of a preliminary injunction (Doc. 30). After conducting a hearing on the motion and considering the pertinent filings, the undersigned recommends that Liberty's Amended Motion for Preliminary Injunction (Doc. 19) be granted.[1]

---

[1] The District Judge referred the matter for issuance of a Report and Recommendation (Doc. 26). *See* 28 U.S.C. § 636. In the Order of Referral, the District Judge indicated that, although titled as an amended motion for temporary restraining order and preliminary injunction, the Court would "treat this motion as one for preliminary injunction, as notice has been provided to the adverse party" (Doc. 26, at 1 n.1). Accordingly, this Report and Recommendation only pertains to the request for a preliminary injunction.

## I.    Background

Liberty is the franchisor of Liberty Tax Service income tax preparation service centers located throughout the United States (Doc. 15, ¶14).  Liberty has spent substantial time and money advertising and promoting the Liberty Tax Service tax preparation system, which sells income tax preparation and filing services and products to the public under Liberty's various trademarks (Doc. 15, ¶15).  Liberty asserts that it has become one of the largest and most recognized tax preparation franchises in the United States (Doc. 15, ¶17).

Pursuant to its franchise agreements, Liberty discloses certain confidential information and trade secrets, including Liberty's confidential Operations Manual, methods of operation of a franchise, customer information and records, and marketing information to franchisees (Doc. 15, ¶16).  In return, Liberty requires its franchisees to agree that, upon expiration, termination, or nonrenewal of a franchise agreement, they will never use, disclose, or permit the use or disclosure of its confidential information (Doc. 15, ¶¶21-22 & Ex. A-F, § 12).[2]  Additionally, the franchisee agrees that, upon termination, expiration, or nonrenewal of a franchise agreement, the former franchisee will stop using all literature and forms received,

---

[2] Exhibits A through F attached to the Verified Amended Complaint comprise all six of the Franchise Agreements entered into between Liberty and Defendants.  As noted below, the parties agree that all the provisions contained in the Franchise Agreements are identical or substantially identical.  Accordingly, in referencing a relevant section of the Franchise Agreements, the undersigned will cite to the relevant provision of all the Franchise Agreements as "(Doc. 15, Ex. A-F, § __)."  The provisions cited will be the ones found in the Franchise Agreement attached as Exhibit A to the Verified Amended Complaint.

return all confidential information, and return all copies of its Operations Manual and any updates thereto (Doc. 15, ¶28 & Ex. A-F, § 9).

G-QTS Inc. entered into six franchise agreements with Liberty for territories located in the Tampa and Saint Petersburg areas (the "Franchise Agreements") (Doc. 15, ¶20 & Ex. A-F).  Gilbert, as the individual signatory for G-QTS Inc., personally agreed to perform all the obligations under the Franchise Agreements, including without limitation all obligations related to the covenants not to compete, covenants not to solicit, and confidentiality obligations (Doc. 15, Ex. A-F, § 27). The six Franchise Agreements contain substantively identical rights and obligations (Doc. 15, Ex. A-F).  Specifically, in exchange for the right to operate a Liberty franchise to sell tax preparation services and Liberty's disclosure of its trade secrets, Defendants agreed:

- To comply with all federal, state and local laws, regulations, ordinances and the like, and to be responsible for such compliance by all employees of the Franchised Businesses (Doc. 15, Ex. A-F, § 6(w));

- That no person who prepares or supervises the preparation of federal tax returns at Defendants' Franchised Business shall be permitted to undertake such activities unless such person has an active valid preparer tax identification number (PTIN) (Doc. 15, Ex. A-F, § 6(xii));

- That if they breached Section 6(w)-(x) of the Franchise Agreement, then Liberty may terminate the Franchise Agreement without notice and the opportunity to cure (Doc. 15, Ex. A-F, § 8(b)(iii));

- Upon termination, expiration, or non-renewal ("termination"), to assign to Liberty all phone numbers used in connection with the operation of the Franchised Businesses; assign to Liberty

4

any interest in any leases; deliver to Liberty all customer lists, tax returns, files, and records; return Liberty's confidential Operations Manual; and adhere to the Franchise Agreements' post-termination non-competition and non-solicitation covenants (Doc. 15, Ex. A-F, § 9);

- Post-termination, for a period of two years following the termination, expiration, transfer or other disposition of the Franchised Businesses not to directly or indirectly, for a fee or charge, prepare or electronically file income tax returns within the territory or within 25 miles of the boundaries of the territory (Doc. 15, Ex. A-F, § 10(b));

- Post-termination, for a period of two years following the termination of the Franchise Businesses, Defendants would not within the territory or within 25 miles of the boundaries of the territory directly or indirectly solicit the patronage of any person or entity served by any of Defendants' Liberty offices in the last 12 months that Defendants were a Liberty franchisee for the purpose of offering such person or entity, for a fee or charge, income tax preparation, electronic filing of tax returns, or financial products (Doc. 15, Ex. A-F, § 10(d));

- That the provisions of Section 10 (*i.e.*, the non-competition and non-solicitation covenants) are reasonable, valid, and not contrary to the public interest and that Liberty is entitled to a temporary restraining order, preliminary injunction, and/or permanent injunction for any breach of duties under any of the non-monetary obligations of Sections 9 and 10 (Doc. 15, Ex. A-F, § 10(h)); and

- To refrain from using Liberty's trade secrets and confidential information following termination of the Franchise Agreement (Doc. 15, Ex. A-F, § 12).

Based on an investigation, Liberty determined that G-QTS Inc. allowed one of its employees, Kesha Mooney ("Mooney"), to prepare and file federal tax returns using Gilbert's own PTIN (Doc. 15, ¶¶38-39). Liberty previously suspended Mooney's access to the Liberty tax preparation system because it became aware of

5

criminal charges pending against her (Doc. 37-1, Supplemental Declaration of Brian Panelo ("Panelo Supp. Decl."), ¶4).  According to Liberty, when Liberty confronted Gilbert concerning these facts, he did not deny that Mooney had been preparing and filing returns using his PTIN (Doc. 15, ¶38).

Shared use of PTIN numbers violates federal law.  *See* 26 U.S.C. § 6109(a)(4) ("Any return or claim for refund prepared by a tax return preparer shall bear such identifying number for securing proper identification of such preparer, his employer, or both, as may be prescribed."); 26 C.F.R. § 1.6109-2(a)(1) ("Each filed return of tax or claim for refund of tax under the Internal Revenue Code prepared by one of more tax return preparers must include the identifying number of the tax return preparer required by § 1.6695-1(b) to sign the return or claim for refund.  In addition, if there is an employment arrangement or association between the individual tax return preparer and another person … the identifying number of the other person must also appear on the filed return or claim for refund").  The Internal Revenue Service (IRS) "requires paid return preparers to identify themselves on the returns they prepare for customers by including their [PTIN] on the return." *See United States v. Espinal*, CASE NO. 11-20418-CIV-MCALILIEY, 2021 WL 3666323, at *4 (S.D. Fla. Aug. 18, 2021).  "Individuals who prepare but do not sign returns are known as 'ghost' preparers" and the "IRS can assess penalties against return preparers who

not comply with the [PTIN] requirements of 26 U.S.C. § 6109" in addition to

seeking injunctive relief against the preparer.  *Espinal*, 2021 WL 3666323, at *4.[3]

While Defendants claim that Mooney used Gilbert's PTIN without his

knowledge, Liberty contends that such claim is not plausible.  Previously, Gilbert

had never prepared tax returns on the Liberty system using his own PTIN (Panelo

Supp. Decl., ¶4).  Then, right after Liberty suspended Mooney's access to the system

(over Gilbert's objections), tax returns began getting filed under Gilbert's PTIN, and

Liberty received an anonymous report on its ethics hotline that Gilbert had directed

---

[3] *See also* IRS guidance available at https://www.irs.gov/tax-professionals/frequently-asked-questions-do-i-need-a-ptin (last visited on May 11, 2022), which includes the following questions and answers:

**4. Can multiple individuals or one office share one PTIN?**
No, every individual who, for compensation, prepares or assists in the preparation of a tax return or claim for refund must have his or her own PTIN and each tax return preparer may only obtain one PTIN.

**5. If I don't have a PTIN, can I still prepare tax returns for compensation?**
No. You must have a PTIN to prepare tax returns for compensation.

\*\*\*

**13. When multiple paid preparers are involved in preparation and/or review of a return, who is required to sign the return?**
Existing Treasury regulations under sections 1.6695-1(b) and 301.7701-15(b)(1) provide that a signing tax return preparer is the individual tax preparer who has the primary responsibility for the overall accuracy of the preparation of a return.  The PTIN requirements, which require all preparers to register and obtain a PTIN, do not change the existing rules regarding who is the signing tax return preparer.

**14. Are non-signing preparers disclosed on each return prepared even if another preparer reviews and signs it?**
No, the names of non-signing preparers are not disclosed on the return.  Although there is no plan to expand the paid preparer section of the return to include non-signing preparers, they still are required to have a PTIN.

Mooney to prepare returns using his PTIN (Panelo Supp. Decl., ¶¶4-5). Following an investigation, Liberty learned from Defendants' store managers that Gilbert had not actually been filing returns (Panelo Supp. Decl., ¶5). Two customers whose returns were prepared under Gilbert's PTIN informed Liberty that Mooney prepared their returns, not Gilbert (Panelo Supp. Decl., ¶5).

Though Defendants dispute such assertion, Liberty asserts that Mooney could not have used Gilbert's PTIN without Gilbert's knowledge because Liberty's tax preparation software includes a multi-factor authentication process. As part of that multi-factor authentication process, Gilbert received a key fob that generates a random set of numbers which must be entered into the tax software to access the system (Panelo Supp. Decl., ¶6). According to Liberty, no one could prepare a return on the Liberty system using Gilbert's PTIN unless they had his key fob, which he was prohibited from sharing with anyone else (Panelo Supp. Decl., ¶6). The key fob serves no other purpose, so Liberty contends that no legitimate reason existed for Mooney to have access to Gilbert's key fob other than to facilitate her illegally preparing returns using Gilbert's PTIN (Panelo Supp. Decl., ¶6). Liberty thus contends that the record supports the inference that Mooney's use of Gilbert's PTIN was a deliberate course of conduct by Gilbert to defy Liberty's decision to suspend Mooney's access to its system while she faced serious criminal fraud charges and to flout federal law in doing so.

Gilbert refutes Liberty's suggestion that, because he did not prepare returns previously with his PTIN, the Court can draw the conclusion that he engaged in,

directed, or otherwise supported Mooney's use of his PTIN (Doc. 38, Supplemental Declaration of Stephen A. Gilbert ("Gilbert Supp. Decl."), ¶¶4-8).  Rather, Gilbert asserts that any alleged returns submitted by Mooney (following Gilbert suspending her based on Liberty's suspension of her access to Liberty's system after learning of charges pending against her) were returns she or another employees began prior to her suspension and that she, without Gilbert's knowledge, submitted those returns using Gilbert's PTIN (Gilbert Supp. Decl., ¶4).  As Gilbert explains, a return can be and usually is prepared by two or more preparers such that the preparer who ultimately submits the return and inputs the final PTIN is not necessarily and does not need to be the preparer who first began the return (Gilbert Supp. Decl., ¶5). Gilbert asserts that, to the extent that returns were prepared using his PTIN, many of those were simply returns started by another employee placed in an "on hold" status that he subsequently submitted after final review or were submitted without his knowledge or authorization (Gilbert Supp. Decl., ¶5).  Even considering Gilbert's explanation, on this record, Gilbert is, at worst, intentionally culpable for the illegal use of his PTIN or, at best, negligent in allowing Mooney access to the office and computer logged in with his PTIN.

Regardless, Mooney's submission of the returns using Gilbert's PTIN violated federal law and thus violated the terms of the Franchise Agreements. Indeed, G-QTS Inc. and Gilbert, who both agreed to be bound individually under the Franchise Agreements, breached Section 6(w) (requiring compliance with federal law) of each of the Franchise Agreements.  Upon Defendants' violations of

federal law in breach of Sections 6(w)-(x), Liberty maintained the right to terminate G-QTS Inc. as a franchisee (Doc. 15, Ex. A-F, § 8(b)(iii)).  Accordingly, on March 5, 2022, Liberty sent Defendants a letter terminating all six of Defendants' Franchise Agreements, effective immediately, because Defendants breached the Franchise Agreements and violated federal law by allowing shared use of a PTIN (Doc. 15, ¶¶37-40 & Ex. K).  In the termination letter, Liberty reminded Defendants of their obligations under the Franchise Agreements, including their obligations to:

- Deliver to Liberty all paper and electronic copies of Defendants' customer lists, tax returns, files, and records; Deliver to Franchisor all customer tax returns, files, records, and all copies thereof;

- Deliver to Liberty the Operations Manual and all updates which Liberty loaned to Defendants;

- Upon Liberty's request, assign any interest Defendants had in any lease, sublease, or any other agreement related to the Franchised Business;

- Cease using and forever refrain from using and disclosing Liberty's confidential information and trade secrets; and

- Adhere to the provisions of the post-termination covenants not to compete and not to solicit in the Franchise Agreements.

(Doc. 15, ¶40 & Ex. K).

That same day, Liberty and Defendants executed Lease Surrender Agreements with respect to the franchise office locations located at: (a) 2156 34th Street South, Saint Petersburg, Florida; (b) 3713 49th Street North, Saint Petersburg, Florida; (c) 7075 West Waters Avenue, Tampa, Florida; and (d) 13803 West Hillsborough Avenue, Tampa, Florida (Doc. 15, ¶41 & Ex. G-J).  The Lease

Surrender Agreements indicate that Defendants desired to surrender the leases to Liberty and that Liberty was willing to accept the surrender on the terms and conditions set forth in the Lease Surrender Agreements (Doc. 15, Ex. G-J). Namely, in the Lease Surrender Agreements, Defendants agreed that, as of March 5, 2022, Defendants assigned the Lease, the Premises, and all rights to the Premises granted to Defendants pursuant to the Lease and that Liberty accepted such surrender and released Defendants from the remaining terms of the Leases (Doc. 15, Ex. G-J, § 1).  Defendants further agreed that, regardless of the forms and documents that Defendants may have signed under this provision, Defendants irrevocably granted Liberty full power and authority for the sole purpose of taking any necessary action to complete the transfers required pursuant to Section 2 of the Lease Surrender Agreements (Doc. 15, Ex. G-J, § 2).[4]

Independently of the Lease Surrender Agreements, Liberty maintains the right to take assignment of the leases under the Franchise Agreements.  Specifically, in Section 9(f) of the Franchise Agreements, Defendants agreed to assign to Liberty any interest Defendants had in any lease, sublease, or any other agreement related to the Franchised Business upon termination (Doc. 15, Ex. A-F, § 9(f)).  Defendants further agreed to irrevocably appoint Liberty as Defendants' true and lawful agent and attorney-in-fact with full power and authority for the sole purpose of taking any

---

[4]  In setting forth its claims for breach of contract in the Amended Complaint, Liberty did not include the Lease Surrender Agreements as contracts that had allegedly been breached. Consequently, the Lease Surrender Agreements do not form a basis for the injunctive relief requested and will only be referenced to provide context.

necessary action to complete the assignments required pursuant to Section 9 of the Franchise Agreements pertaining to post-termination obligations (Doc. 15, Ex. A-F, § 9(f)).

Since termination of the Franchise Agreements and the execution of the Lease Surrender Agreements, Defendants have failed to execute documents necessary to assign leases to Liberty (Doc. 15, ¶60).  Instead, Defendants argued to Liberty that the Lease Surrender Agreements were unconscionable, purported to rescind them, and demanded that Liberty return possession of the franchise office locations (Doc. 15, ¶61 & Ex. L).  Relying upon Defendants' purported rescission, Defendants then took steps to directly interfere with the assignment of leases to Liberty (Doc. 15, ¶62).

Subsequently, on March 15, 2022, Defendants, through counsel, contacted the landlord for the Liberty location at 3713 49th Street North, Saint Petersburg, Florida, stating that the Lease Surrender Agreement for the location was rescinded and requesting that possession of the location be restored to Defendants (Doc. 15, ¶63 & Ex. M).  Defendants subsequently contacted the landlord for the Liberty location at 3713 49th Street North, Saint Petersburg, Florida, requesting a copy of the key for the location (Doc. 15, ¶64 & Ex. M).  As a result of Defendants' actions, the landlord for the Liberty location at 3713 49th Street North, Saint Petersburg, Florida, has denied that it is obligated to provide a key to Liberty and denied that it had consented to the change in possession of the location to Liberty (Doc. 15, ¶65 & Ex. M).

The next day, Gilbert brought a locksmith to the premises at both 2156 34th Street South, Saint Petersburg, Florida, and 3713 49th Street North, Saint Petersburg, Florida, and changed the locks at both locations (Doc. 15, ¶47). While changing the locks at the Liberty locations on March 16, 2022, Gilbert also communicated with potential customers of Liberty, informing at least one potential Liberty customer that the Liberty office location could not provide services "today" (Doc. 15, ¶48). A day later, Defendants' counsel informed Liberty's counsel that Defendants sought to continue tax preparation services out of the Franchise Locations (Doc. 15, ¶48 & Ex. N).

In changing the locks for the Liberty location at 3713 49th Street North, Saint Petersburg, Florida, Gilbert did not provide Liberty employees at the office with a new key (Doc. 15, ¶49). As a result, Liberty personnel cannot exit and reenter the premises at 3713 49th Street North, Saint Petersburg, Florida (Doc. 15, ¶49). In changing the locks for the Liberty location at 2156 34th Street South, Saint Petersburg, Florida, Gilbert initially provided Liberty employees at the office with a new key (Doc. 15, ¶50). After providing a key to Liberty employees at the Liberty location at 2156 34th Street South, Saint Petersburg, Florida, however, Gilbert remained at the office location and told Liberty employees at the office location to leave (Doc. 15, ¶51). According to Liberty, Gilbert later demanded that the Liberty employees at the office location at 2156 34th Street South, Saint Petersburg, Florida, return the key to Gilbert (Doc. 15, ¶52). Liberty contends that Gilbert's actions in changing the locks and removing Liberty equipment interfered with Liberty's ability

to conduct business at the two Liberty locations during the recent busy tax season (Doc. 15, ¶53).

Against that backdrop, Liberty initiated this action, asserting claims for breach of the Franchise Agreements, conversion, violation of the DTSA, and unfair competition and seeking injunctive, monetary, and declarative relief against Defendants (Doc. 1).  At the same time, Liberty moved for a temporary restraining order (Doc. 11).  Specifically, by the motion for temporary restraining order, Liberty sought an order immediately prohibiting Gilbert from entering onto or otherwise interfering with the operation of Liberty's franchise locations; requiring Defendants to provide Liberty with keys for any new locks installed by Defendants at Liberty's franchise locations; requiring Defendants to return Liberty's equipment (including computers and printers) and other property removed from Liberty's franchise locations; requiring Defendants to execute any and all documents necessary to assign the leases from Defendants to Liberty for the Liberty franchise locations identified in the Lease Surrender Agreements; prohibiting Defendants from obstructing or otherwise interfering with the assignment of leases from Defendants to Liberty for the Liberty franchise locations identified in the Lease Surrender Agreements; and requiring Defendants to return Liberty's confidential information and client files and otherwise comply with the post-termination obligations under the Franchise Agreements (Doc. 11, at 4).

As noted above, upon consideration of the allegations set forth by Liberty, the District Judge deferred ruling on Liberty's request for entry of a temporary

restraining order to allow for supplemental briefing on the issue of amount of security (Doc. 13). Shortly thereafter, Liberty submitted its Verified Amended Complaint and a request for supplemental briefing and a consolidated hearing on its request for a temporary restraining order and preliminary injunction (Docs. 15 & 16). Following that, the District Judge denied the request for a temporary restraining order as moot, given the filing of the Verified Amended Complaint, and granted in part and denied in part Liberty's request for supplemental briefing and a consolidated hearing, allowing Liberty to submit an amended motion seeking injunctive relief and to submit supplemental briefing in support (Doc. 18).

In the meantime, after Liberty filed its Verified Complaint and its Emergency Motion for Temporary Restraining Order, Defendants removed Liberty signs at two Liberty franchise locations in Saint Petersburg and installed signs for "Fast Tax" (a competing tax preparation business) at those locations and are now operating an allegedly competing business at the Liberty franchise locations (Doc. 15, ¶¶4, 67-69). Liberty alleges that Defendants' new conduct violates Section 10(b) of the Franchise Agreements, which prohibits Defendants from operating a tax return preparation business within 25 miles of Liberty franchise territories for two years following termination of the Franchise Agreements (Doc. 15, ¶30 & Ex. A-F, § 10(b)). Indeed, Defendants admit that they are running a competing tax preparation business at the two former Liberty locations in Saint Petersburg (Doc. 30, at 6 (admitting that Gilbert is currently operating an independent tax business, Fast Tax Group, from two of the former Liberty locations)).

Further, Liberty indicates that, following termination of the Franchise Agreements, Defendants failed to return Liberty's client files and other confidential information and other property, including at least portions of Liberty's confidential Operations Manual, computers, and printers (Doc. 15, ¶70).  Additionally, on or about March 15, 2022, purportedly at Gilbert's direction, Mooney, the former tax preparer at the franchise locations who used Gilbert's PTIN, entered the office at 2156 34th Street South, Saint Petersburg, Florida, and removed two printers from the location (Doc. 15, ¶44).  Liberty alleges that Mooney told a Liberty employee who witnessed her removing the printers that Gilbert instructed her to retrieve the printers from the Liberty location (Doc. 15, ¶45).  Under the Lease Surrender Agreement, Liberty owned the printers that Mooney removed (Doc. 15, ¶46 & Ex. G).  Gilbert denies such allegation, asserting that he never advised Mooney to take Liberty property from the franchise locations (Gilbert Supp. Decl., ¶9).

By the amended motion for preliminary injunction, Liberty seeks to restrain and enjoin Defendants from competing against Liberty in violation of the Franchise Agreements and to assign leases and return confidential information to Liberty (Doc. 19).  Liberty contends that it established a likelihood of success on the merits of its claims for breach of the Franchise Agreements; it will suffer irreparable harm in the form of confusion, loss of sales, loss of goodwill, and monetary damages; the harm to Liberty substantially outweighs any harm to Defendants – harm which Liberty contends was self-inflicted by Defendants; and an injunction serves the public interest by enforcing valid, binding agreements that are reasonable in scope

and necessary to prevent irreparable harm to Liberty's franchise business.  Liberty thus seeks entry of a preliminary injunction:

- Enjoining Defendants from operating a tax preparation business at the former franchise locations until March 5, 2024;

- Enjoining Defendants from operating competing tax return preparation businesses within 25 miles of their Liberty franchise territories until March 5, 2024;[5]

- Ordering Defendants to assign the leases for each of the franchise locations to Liberty and to refrain from interfering with Liberty's right to act as Defendants' lawful agent and attorney-in-fact for the purpose of taking necessary action to complete assignment of the leases;

- Enjoining Defendants from causing or attempting to cause locks to be changed at a franchise locations and/or removing property from any franchise locations;

- Enjoining Defendants from using any of Liberty's confidential information;

- Enjoining Defendants from entering onto or otherwise interfering with the operation of Liberty's franchise locations;

- Ordering Defendants to return all Liberty confidential information, including all Liberty client files;

- Ordering Defendants to return Liberty's equipment (including printers and computers) and other property removed from Liberty's franchise locations; and

- Ordering Defendants to provide Liberty with a key for any new locks installed by Defendants at Liberty's franchise locations.

---

[5]  Prior to termination of the Franchise Agreements, Liberty permitted Gilbert to operate one tax preparation office, located at 7606 North Nebraska Avenue, Tampa, Florida, which operated outside of the Liberty system and within 25 miles of a Liberty territory.  By the motion, Liberty does not seek to enjoin Gilbert from continuing to operate at the 7606 North Nebraska office (Doc. 19, at 3 n.1).

In response, Defendants argue that an injunction should not issue because Liberty cannot establish a likelihood of success on its claims, Liberty will suffer no harm if an injunction does not issue, the balance of harm greatly favors Defendants, and the public interest would be disserved by issuance of an injunction (Doc. 30). Namely, Defendants argue that Liberty's request for a mandatory injunction should be denied based on several deficiencies, including: (1) Liberty cannot show a violation of law since it fails to show the inapplicability of the alleged small transgression committed by Mooney in using Gilbert's PTIN; (2) Liberty failed to show that the transgression, even assuming it occurred and no defenses apply, was material so as to justify a complete forfeiture of Gilbert's business, which he values at $1.5 million; (3) Liberty's request for a mandatory injunction, even if based on a legitimate and material ground for termination, seeks to disturb the status quo (Gilbert in possession of two locations, and Liberty in possession of two locations) by having the Court issue a mandatory not prohibitory injunction (seeking relief forcing Gilbert to execute new assignment agreements that are not yet in existence); (4) Liberty comes to the Court with unclean hands, *i.e.*, allegedly prior material breach in wrongfully terminating Gilbert's franchises, fraudulent conduct in extorting the Lease Surrender Agreements, and repeatedly and unlawfully trespassing on Gilbert's franchise locations and poaching his employees; and (5) Liberty presented no evidence in support of all four prongs of the motion but rather relied upon speculative, conclusory allegations instead of facts.  Beyond that, Liberty requests that, if the Court grants the request for an injunction, it require

Liberty to post a bond for $1.5 million, or Gilbert's estimated value of his businesses before Liberty's purported wrongful terminations.

Liberty submitted a reply to address the arguments raised by Defendants in their response (Doc. 37).  Primarily, Liberty argues that it maintained the right to immediately terminate the Franchise Agreements when Defendants violated federal law, it possesses a legitimate business interest in enforcing the non-compete provisions in its Franchise Agreements, statements made in Gilbert's declaration in support of Defendants' response are either contradicted by the written record or are implausible, the cases relied upon by Gilbert are distinguishable, and Defendants are not entitled to a $1.5 million bond.  Thereafter, Defendants sought to supplement their declarations to address arguments raised and statements made in Liberty's reply, which the undersigned permitted (Docs. 38, 39, 42).

Following referral by the district judge, the undersigned conducted a hearing on the motion for preliminary injunction.  During the hearing, both parties appeared and presented oral argument.  Having considered the parties' arguments and the pertinent filings, the undersigned recommends issuance of the preliminary injunction for the reasons detailed below.

## II.    Standard of Review

The decision to grant or deny a preliminary injunction falls within the discretion of the district court.  *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002); *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997) (*per curiam*).  In determining whether

a preliminary injunction should issue, the court considers whether the moving party demonstrated (1) a substantial likelihood of success on the merits; (2) irreparable harm to the moving party unless the injunction issues; (3) that the threatened harm to the moving party outweighs the potential harm the proposed injunction may cause the opposing party if the injunction issues; and (4) if issued, the injunction would not disserve or be adverse to the public interest.  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  Since a preliminary injunction is an extraordinary and drastic remedy, a court should not issue a preliminary injunction unless the moving party clearly establishes the burden of persuasion as to each of the four prerequisites. *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1210 (11th Cir. 2003).

### III.  Discussion

#### A.  Likelihood of Success on the Merits

The first factor in determining whether a preliminary injunction should issue is whether Liberty can show a substantial likelihood it will prevail on the merits of its claims.  In this instance, Liberty moves for injunctive relief solely on the claims for breach of the Franchise Agreements.  Based on the record before the Court, Liberty demonstrated a substantial likelihood of success on the merits of its breach-

of-contract claims.[6]  Namely, to prevail on a breach-of-contract claim in Virginia,[7] a party must demonstrate (1) a legally enforceable obligation; (2) violation or breach of that obligation; and (3) injury or damage caused by the breach of that obligation. *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).

### i.      Legally Enforceable Obligation

Turning to the first element, Liberty demonstrated that the six Franchise Agreements, including the post-termination non-competition and non-solicitation provisions, provide legally enforceable obligations (Doc. 15, Ex. A-F).  Indeed, Defendants do not dispute the existence of the Franchise Agreements nor that they entered into the Franchise Agreements with Liberty and agreed to abide by the terms contained therein, including both the in-term and post-termination provisions.  Accordingly, Liberty established the first element for a breach-of-contract claim under Virginia law.

### ii.     Violation or Breach of Obligation

Liberty also established the second element, *i.e.* that Defendants breached their obligations under the Franchise Agreements.  To wit, Defendants have

---

[6] Liberty additionally moves for a preliminary injunction on its DTSA claim (Doc. 15, Ex. A-F, §§ 9(g)-(i) & 12(a)); Doc. 15, ¶¶71, 102-18).  *See* 18 U.S.C. § 1839(5).  During the hearing on the motion and in its proposed Report and Recommendation, Liberty focused its arguments solely upon the breach-of-contract claims.  Accordingly, this Report and Recommendation addresses the propriety of an injunction solely on the breach-of-contract claims.

[7] The Franchise Agreements dictate that: "This Agreement is effective upon its acceptance in Virginia by Liberty's authorized officer.  Virginia law governs all claims that in any way relate to or arise out of this Agreement or any of the dealings of the parties hereto, or dealings between you and any of the Affiliated Companies" (Doc. 15, Ex. A-F, § 18(a)).

breached and continue to breach their obligations under the Franchise Agreements in at least four ways: (i) Mooney's use of Gilbert's PTIN; (ii) by competing against Liberty at the former franchise locations; (iii) by interfering with Liberty's right to take assignment of leases for the former franchise locations; and (iv) by failing to return Liberty's confidential information, client files, and other property including computers and printers. The use of Gilbert's PTIN constituted the initial breach that directly led to the termination of the Franchise Agreements. As indicated, Defendants' Franchise Agreements with Liberty expressly provide that Liberty may terminate the agreements – without notice or an opportunity to cure – if Defendants breach §§ 6(w)-(x) of the agreements. Section 6(w) of the agreements provides that the franchisee "agree[s] to comply with all federal, state and local laws, regulations, ordinances and the like, and to be responsible for such compliance by all employees of the Franchised Business" (Doc. 15, Ex. A-F, § 6(w)). Section 8(b) of the Franchise Agreements provides that "Liberty may terminate this Agreement without notice and the opportunity to cure for any of the following reasons: … (iii) If you breach 6(w)-(x) of this Agreement …" (Doc. 15, Ex. A-F, § 8(b)(iii)). The Franchise Agreements thus expressly authorize Liberty to terminate the agreements based on Defendants' violations of federal law. As explained above, Gilbert's shared use of his PTIN with Mooney, whether intentional or accidental, established a breach of Section 6(w) (requiring compliance with federal law) of each of the Franchise Agreements, thereby triggering Liberty's right to terminate Defendants'

Franchise Agreements under Section 8(b)(iii) of the Franchise Agreements without notice and opportunity to cure.

Liberty also demonstrated that Defendants breached the post-termination provisions of the Franchise Agreements, including the non-competition provision. Post-termination, Defendants were prohibited from: (1) directly or indirectly competing with Liberty by electronically filing income tax returns or offering financial products within 25 miles of the franchise territories during the two years following termination, or (2) directly or indirectly soliciting customers that the franchised businesses had served within the 12 months preceding termination for the purpose of offering income tax preparation and filing or financial products within 25 miles of the territories during the two years following termination (Doc. 15, Ex. A-F, §§ 9(k), 10(b), 10(d)).  Defendants have breached these provisions by launching competing tax preparation businesses at two of the former franchise locations (Doc. 15, ¶¶67-69; Doc. 30, at 6 (admitting that Mr. Gilbert is currently operating an independent tax business, Fast Tax Group, from two of the former Liberty locations)).  *See*, *e.g.*, *JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 823 (E.D. Va. 2007) (holding that Liberty presented "voluminous evidence" of breach at preliminary-injunction stage where Liberty validly terminated franchise agreement and former franchisee opened competing tax preparation businesses at three former franchise locations).

Notably, in Virginia, restraints on trade are disfavored and courts therefore enforce non-competition agreements between an employer and employee "if the

contract is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy." *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005); *see Preferred Sys. Sol., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012).   In the franchise context, however, "Virginia courts analogize non-compete clauses to those in the 'sale of business' context," affording "greater deference to non-compete restraints between a buyer and a seller than to those between an employer and an employee." *JTH Tax, Inc. v. Frashier,* Civil Action No. 2:09cv40, 2009 WL 10689306, at *2 (E.D. Va. Apr. 15, 2009).   Even though courts afford more deference in the franchise context, the factors for enforceability of the restraint on trade are the same, *i.e.*, "the restraint must not be (1) more restrictive than necessary to protect a business interest; (2) 'unduly harsh or oppressive' in restricting one's ability to earn a livelihood; or (3) offensive to public policy."   *Id.* at *3.   In evaluating these factors, courts consider the function, geographic scope, and duration of the restriction.   *Preferred Sys. Sol., Inc.*, 732 S.E.2d at 681; *see Frashier,* 2009 WL 10689306, at *3.   The burden of establishing these factors falls on the employer or, in our case, the franchisor.   *Preferred Sys. Sol., Inc.*, 732 S.E.2d at 681 (citation omitted).   Importantly, in Virginia, equity will enforce non-competition covenants by injunction when warranted by the facts of the case. *CaterCorp, Inc. v. Catering Concepts, Inc.*, 431 S.E.2d 277, 282 (Va. 1993).   Whether a restrictive covenant is enforceable under Virginia law is a question of law to be determined by the court.   *Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2001).

Here, the post-termination obligations under Liberty's franchise agreements are narrowly tailored in function, geographic scope, and duration and necessary to protect Liberty's goodwill and reputation.  In fact, courts have repeatedly enforced Liberty's non-compete and other post-termination obligations as reasonable restraints of trade.  *See, e.g., JTH Tax, Inc. v. Magnotte*, Case No. 19-cv-11607, 2020 WL 4284056 (E.D. Mich. July 27, 2020); *JTH Tax LLC v. McHugh*, Case No. C20-329RSM, 2020 WL 1689731, at *4 (W.D. Wash. Apr. 7, 2020); *JTH Tax LLC v. Silva*, Case No. 8:20-CV-00288-MSS-AEP, 2020 WL 3266568, at *2 (M.D. Fla. Mar. 11, 2020); *JTH Tax, Inc. v. Abikarram*, Case No. 19-CV-60328-UNGARO/HUNT, 2019 WL 2254816, at *2-5 (S.D. Fla. Mar. 22, 2019), *report and recommendation adopted*, 2019 WL 11553446 (S.D. Fla. July 19, 2019); *Frashier*, 2009 WL 10689306, at *2-3; *Lee*, 514 F. Supp. 2d at 821-26; *JTH Tax, Inc. v. Donofrio*, Civil Action No. 2:06cv47, 2006 WL 2796841, at *4-5 (E.D. Va. Sep. 26, 2006). For example, in *Frashier*, the Eastern District of Virginia concluded that the non-compete provision in Liberty's franchise agreement is reasonable because "the scope is limited in terms of duration (two years); geography (twenty-five miles of Defendant's previous territory); and function (tax preparation)."   2009 WL 10689306 at *3.  The *Frashier* Court concluded that "[t]hese conditions, to which Defendant agreed, do not unduly hamper Defendant's ability to earn a living, and they are not more restrictive than necessary to protect Plaintiff's business interests." *Id.*  The Franchise Agreements between Liberty and Defendants contain identical restrictions, which the undersigned finds reasonable for the same reasons, including,

most importantly, Gilbert's agreement that the non-competition and non-solicitation covenants are "reasonable, valid and not contrary to the public interest" and waiver of all defenses to the strict enforcement of those provisions (Doc. 15, Ex. A-F § 10(h)).  *See Silva*, 2020 WL 3266568, at *1 (entering temporary restraining order against former Liberty franchisee and noting that defendant had agreed Liberty would be entitled to injunctive relief if he breached restrictive covenants).

Defendants cite *Pirtek USA, LLC v. Wilcox*, No. 6:06-cv-566-Orl-31KRS, 2006 WL 1722346 (M.D. Fla. June 21, 2006), for the proposition that a non-compete is not enforceable where there is no protectable business interest (Doc. 30, at 24-25).[8] Defendants then claim that Liberty has no protectable business interest because it never provided any trade secrets or "unique training and resources" to Defendants as franchisees (Doc. 30, at 25).  Defendants' arguments are unpersuasive.  While Gilbert stated in his own declaration that Liberty never provided him with initial operators training (IOT) or other training, and that Liberty never provided him with an Operations Manual (Doc. 30-2, Declaration of Stephen A. Gilbert ("Gilbert Decl."), ¶¶82-83), Liberty adduced written proof that it did both of those things

---

[8] Defendants' contention that Liberty has no legitimate interest in enforcing the non-compete provision is inconsistent with Section 10(g) of the Franchise Agreements in which Defendants expressly acknowledged that "the qualifications to be a Liberty franchisee are special, unique and extraordinary, and that Liberty would not enter into this Agreement without the inclusion of the conditions set forth in Section 10," and with Section 10(h) of the Franchise Agreements in which Defendants agreed that "the provisions of Section 10 are reasonable, valid and not contrary to the public interest," and agreed to "waive all defenses to the strict enforcement of Section 10," and that "Liberty is entitled to a temporary restraining order, preliminary and/or permanent injunction for any breach of duties under any of the non-monetary obligations of Sections 9 and 10" (Doc. 15, Ex. A-F, §§ 10(g) & (h)).

(Panelo Supp. Decl., ¶¶24-25 & Ex. D).  Defendants' reliance on *Pirtek* is also inapt because *Pirtek* was decided under Florida law, including Section 542.335, Florida Statutes, which specifically says that "[a]ny restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable."  Fla. Stat. § 542.335(1)(b).  Here, Virginia law governs, and, as discussed above, under Virginia law, Liberty maintains protectable business interests in enforcement of its non-competition agreements.

Defendants further argue that, under Virginia law, a breach of a franchise agreement must be material for a franchisor to terminate a franchise agreement, even if the agreement says it can be terminated regardless of materiality of the breach.  Defendants rely upon *RW Power Partners, L.P. v. Virginia Elec. & Power Co.*, 899 F. Supp. 1490 (E.D. Va. 1995), which discusses the general rule that a material breach is necessary to terminate a contract while considering "the equally significant rule that the parties, by agreement, may abrogate such common law principles and, when that occurs, the courts must enforce the clear terms of the agreement."  *Id.* at 1495.  As the *RW Power* Court explained, under Virginia law:

> Where the breach is not material and the contract does not explicitly state that an immaterial breach will excuse further performance, termination of the contract is improper, and the injured party is limited to damages for the breach.  The Supreme Court of Virginia … has underscored the principle that, unless there is a provision in a contract clearly and expressly allowing forfeiture, the breach of a covenant does not justify cancellation of the entire contract.
>
> Of course, where the contract language makes it clear that the parties have agreed that any breach, material or not, permits cancellation, the courts must give effect to that agreement.  Such an agreement, however, may not be lightly inferred nor may the courts, by

interpretation, supply that which has not been made explicit.

*See id.* at 1502 (internal citation omitted); *see also Safeway, Inc. v. Plaza Co. of Va.*, 444 S.E.2d 544, 545 (Va. 1994) (reversing lower court and ruling that lessee validly terminated lease where agreement "did not require a showing of materiality" to terminate if lessor changed size of parking area without lessee's consent);[9] *Reston Recreation Center Assocs. v. Reston Prop. Investors Ltd. P'ship*, 384 S.E.2d 607, 610 (Va. 1989) (finding termination of lease was valid "regardless of the materiality of the breach," where agreement gave landlord right to terminate if tenant did not maintain insurance).

In Section 8 in each Franchise Agreement, Defendants acknowledged and

---

[9] The *Safeway* court explained:

> In entering judgment against Safeway, the trial court ruled that Plaza had not 'materially breached the lease in question.' In so ruling, the court adopted an argument advanced by Plaza in a trial brief that, in order to cancel the lease, Safeway had to show that any breach by Plaza was material. Safeway contends that the lease did not require a showing of materiality, and Plaza now concedes, as well it might, that such a showing was not necessary to establish a breach of Paragraph 4. … Hence, under Paragraph 4, all that Safeway had to show to establish a breach sufficient to justify canceling the lease was that Covington changed the size or arrangement of the parking area without Safeway's written consent.
>
> ***
>
> The theater was [built] in the parking area, resulting in a change in the size or arrangement of the parking area. And the change unquestionably was without Safeway's written consent. Safeway had sufficient justification, therefore, to cancel the lease.

444 S.E.2d at 545-46 (citation omitted).

28

agreed "that all of the obligations under this Agreement are material and essential obligations, that nonperformance of the obligations herein will adversely and substantially affect Liberty and the Liberty system and that Liberty's exercise of the rights and remedies herein are appropriate and reasonable" and that Liberty could terminate the Franchise Agreement without an opportunity to cure for the reasons outlined therein, including breaching Sections 6(w)-(x) of the Franchise Agreement or for a material violation of any law, ordinance, rule, or regulation of a governmental agency or department (Doc. 15, Ex. A-F, § 8). Defendants' violations of federal law prohibiting shared use of a PTIN were material. Importantly, the applicable provisions of the Internal Revenue Code (IRC) provide for penalties based on improper use of PTINs. *See* 26 U.S.C. §§ 6109 & 6695(b) & (c); 26 C.F.R. § 1.6109-2(a)(1). Defendants' violation of those IRC provisions and IRS regulation subjected Liberty to penalties and scrutiny by the IRS as the provisions and regulations directly prohibit a person preparing tax returns from using another person's PTIN. The argument that such violation, even if the penalties remain small, is immaterial to a tax preparation company simply lacks merit.

Defendants also breached the provisions regarding assignment of leases following termination of the Franchise Agreements. In Section 9(f) of the Franchise Agreements, Defendants agreed upon termination to "assign to Liberty … any interest [Defendants] have in any lease, sublease or any other agreement related to the Franchised Business" (Doc. 15, Ex. A-F, § 9(f)). Defendants further agreed that "[r]egardless of the forms and documents that may have been signed by

[Defendants] under this provision, [Defendants] hereby irrevocably appoints Liberty as [Defendants'] true and lawful agent and attorney-in-fact- with full power and authority for the sole purpose of taking any necessary action to complete the assignments required pursuant to this section." (Doc. 15, Ex. A-F, § 9(f)).  By failing to assign the leases to Liberty, Defendants have breached their obligations under the Franchise Agreements.  *See also JTH Tax, Inc. v. Aime*, Civil Action No. 2:16cv279, 2016 WL 4182743, at *5 (E.D. Va. Aug. 3, 2016) (entering mandatory injunction requiring former Liberty franchisee to assign leases for franchise locations where defendant had changed locks and launched competing business); *JTH Tax, Inc. v. Sawhney*, 19-cv-4035 (AJN), 2019 WL 3051760, at *7 (S.D.N.Y. July 11, 2019) (entering temporary restraining order requiring former Liberty franchisee to assign leases for franchise locations in accordance with Section 9(f) of Liberty franchise agreements).

Finally, Defendants breached the Franchise Agreements by initially failing to return to Liberty its confidential information, client files, and equipment, including computers and printers (Doc. 15, ¶70).  The failure to return such confidential information and clients files upon termination violates Section 9(g)-(i) of the Franchise Agreements (Doc. 15, Ex. A-F, § 9(g)-(i)).  *See also Magnotte*, 2020 WL 4284056, at *4 (noting that former franchisees breached post-termination obligations under franchise agreements to return confidential information to Liberty).  Though Defendants contend that they have since gathered and returned or are ready to return Liberty's client files and other confidential information, the

initial failure to do so constitutes another breach of the Franchise Agreements.

In sum, Liberty demonstrated that Defendants breached the Franchise Agreements.  The initial breach occurred when Mooney used Gilbert's PTIN, leading to termination of the Franchise Agreements, and then the subsequent breaches occurred when Defendants failed to comply with their post-termination obligations under the Franchise Agreements to not compete with Liberty in the franchise territories, to assign leases, and to return confidential information, client files, and property to Liberty.  Accordingly, Liberty established the second element of a breach-of-contract claim.

### iii.    Injury or Damage Caused from Breach of Obligation

Lastly, Liberty demonstrated that it suffered injury or damage caused by Defendants' breach.  Primarily, Defendants' unlawful competition against Liberty damaged Liberty through loss of customer goodwill and loyalty; loss of business opportunities and relationships to provide tax preparation services and related services; loss of customers; loss of profits; loss of franchisee stability; loss of ability to sell other franchises; and loss of competitive advantage in each of the franchise territories (Doc. 15, ¶81).  Liberty's Regional Director, Brian Panelo, averred that Liberty maintained offices for ten years at both the Saint Petersburg locations where Gilbert now operates (Panelo Supp. Decl., ¶28).  Liberty thereby developed customer goodwill and loyalty at those locations, but that goodwill and loyalty is being damaged every day that Defendants continue to operate a competing "Fast Tax" business at those locations, and Liberty is losing customer relationships and

revenue every time a customer returns to those locations to have their taxes prepared during the busy tax season while Liberty is no longer branded at those locations (Panelo Supp. Decl., ¶30).  This harm stems directly from Defendants' breach of the legally enforceable obligations under the Franchise Agreements and thus establishes the third element of a breach-of-contract claim under Virginia law.  Based on the foregoing, therefore, Liberty demonstrated a likelihood of success on the merits of its breach-of-contract claims.

### B.    Irreparable Harm

As a prerequisite to the entry of a preliminary injunction, the party seeking a preliminary injunction must also establish it will suffer irreparable harm unless the injunction issues.  *See Siegel*, 234 F.3d at 1176.  Even if a plaintiff can establish a substantial likelihood of success on the merits, the absence of a substantial likelihood of irreparable harm to the plaintiff, standing alone, precludes entry of a preliminary injunction.  *Id.*  Indeed, irreparable harm is "the sine qua non of injunctive relief."  *Id.* (citations and quotation marks omitted).  In the context of a preliminary injunction, the asserted irreparable harm must be actual and imminent rather than remote or speculative.  *Id.*  Though economic losses alone will not justify entry of a preliminary injunction, the loss of customers and goodwill constitutes an irreparable injury.  *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (citation omitted).

Here, Liberty contends that it will suffer irreparable harm in the form of the loss of customer goodwill and loyalty; loss of business opportunities and

relationships to provide tax preparation services and related services; loss of customers; loss of profits; loss of franchisee stability; loss of ability to sell other franchises; and loss of competitive advantage in each of the franchise territories (Doc. 15, ¶81; Panelo Supp. Decl. ¶30).  According to Liberty, monetary damages would prove insufficient to address the harm suffered by it because Liberty can only potentially quantify a limited loss of customers but cannot quantify the continuing irreparable damage to the value of Liberty's confidential information, goodwill, customer loyalty, and its ability to sell franchises (Doc. 15, ¶82; Panelo Supp. Decl. ¶30).  As at least one Virginia Circuit Court recognized, franchise agreements generally result in a transfer of goodwill, wherein the initial transfer occurs from the franchisor to the franchisee at the outset of the franchise, and the second transfer occurs as a re-transfer of the goodwill from the franchisee back to the franchisor upon termination or expiration of the franchise agreement.  *Brenco Enter., Inc. v. Takeout Taxi Franchising Sys., Inc.*, No. 177164, 2003 WL 21659422, at *9 (Va. Cir. Ct. May 2, 2003).

Defendants admit that they continue to operate a competing tax preparation business at two of the former franchise locations, despite signing non-compete and non-solicitation agreements, but that they have taken measures to reduce any confusion by customers, such as setting up separate phone lines and changing signage at the locations.   Notwithstanding, Defendants continued breach of the non-compete covenant creates irreparable harm to Liberty as such a continued breach presents Liberty with a high likelihood of permanent loss of former and

potential customers and damage to the goodwill associated with its brand.  *See Lee*, 514 F. Supp. 2d at 825 (finding that the continued breach of the non-compete covenant and continued solicitation of former Liberty customers constituted irreparable injury as it presented Liberty with a high likelihood of permanent loss of former and potential customers); *see also Abikarram*, 2019 WL 2254816, at *4 ("[T]he loss of customers and goodwill constitutes irreparable injury"), *report and recommendation adopted*, 2019 WL 11553446 (S.D. Fla. July 19, 2019); *JTH Tax, Inc. v. Geraci*, No. 2:14cv236, 2014 WL 4955373, at *8 (E.D. Va. Oct. 2, 2014) (finding irreparable harm where "[n]o amount of damages can quantify the potential loss to Liberty's goodwill and its reputation, and failure to enforce the non-compete could send a dangerously damaging signal to other franchisees"); *Donofrio*, 2006 WL 2796841, at *5 ("[W]hen failure to grant injunctive relief creates the possibility of permanent loss of customers to a competitor or the loss of good will, the irreparable harm prong is satisfied."); *Brenco Enter.,* 2003 WL 21659422, at *9 (enforcing the express terms of a franchise agreement that plainly did not intend for the franchisees to own any goodwill, service marks, or any other assets associated with the franchise system after the franchisees left the system).  In fact, "[t]he Eleventh Circuit deems injunctions the normal and favored remedy for violations of restrictive covenants because monetary damages are typically quite difficult to establish and often cannot adequately compensate for that type of breach."  *R.J. Gators Franchise Sys., Inc. v. MBC Restaurants, Inc.*, No. 2:05-cv-00494-VMC-DNF, 2005 WL 4655379, at *5

(M.D. Fla. Nov. 6, 2005) (citing *Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1448–1449 (11th Cir.1991)).

Defendants' failure to adhere to its post-termination obligations under the Franchise Agreements to assign the leases to Liberty, and subsequent blocking of Liberty's access to Liberty franchise locations, also continues to cause irreparable harm to Liberty.  *See also Aime*, 2016 WL 4182743, at *5 (finding "urgent" risk of irreparable harm where former Liberty franchisee changed locks and launched competing business); *Sawhney*, 2019 WL 3051760, at *7 (entering temporary restraining order requiring former Liberty franchisee to assign leases).  Defendants interfered with Liberty's ability to operate at the franchise locations during the busy tax season.   Defendants' conduct in changing locks, communicating with customers, removing equipment, and purporting to rescind the Lease Surrender Agreements interferes with Liberty's ability to operate at the Liberty franchise locations (Doc. 15, ¶66).  Such interference likewise threatens Liberty's goodwill, reputation, and relationship with its customers.

Defendants argue that monetary damages will suffice to compensate Liberty for any harm it suffers, thereby precluding a finding of irreparable harm.  Notably, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (citation omitted).  In Virginia, the proper measure of damages for breach of a covenant not to compete is the lost profits caused by the breach.  *Lee*, 514 F. Supp. 2d at 824.  Here, Defendants did not solely breach the covenant not to compete but rather violated several

provisions of the Franchise Agreements causing harm that monetary damages cannot compensate.   Defendants' suggestion that monetary damages could compensate Liberty for any harm it will suffer resulting from Defendants' actions not consistent with the Franchise Agreements therefore falls flat because, even though lost profits can be quantified, the potential loss of customer goodwill and loyalty; loss of business opportunities and relationships to provide tax preparation services and related services; loss of customers; loss of franchisee stability; loss of ability to sell other franchises; and loss of competitive advantage in each of the franchise territories cannot.   Given the foregoing, Liberty demonstrated that it will suffer irreparable harm if the injunction does not issue, and, thus, this prong of the analysis supports entry of a preliminary injunction.

### C.    Balance of harm

A party seeking a preliminary injunction must further demonstrate that the threatened harm to it outweighs the harm a preliminary injunction may cause to the opposing party.  *Siegel*, 234 F.3d at 1176.  As the Eleventh Circuit cautions, courts should exercise great care before the entire case has been fully and fairly heard to assure that the power of the court to require or deter action does not result in unwarranted harm to the defendant or the public.  *Ala. v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005).  In this instance, Liberty contends that it is suffering and will continue to suffer harm if an injunction does not issue to enforce the terms of the Franchise Agreements since Defendants continue to interfere with Liberty's operations at the franchise locations, its customers, and its

goodwill.  In contrast, Defendants assert that the balance of harm strongly favors them.  Namely, Defendants argue that Liberty's potential harm is non-existent, especially since Liberty previously allowed Defendants to operate one competing tax preparation business at a different location in the franchise territory, or, at best, compensable with monetary damages, whereas the harm suffered by Defendants in having to shut down their tax preparation businesses until a full trial on the merits is actual and severe.

Initially, Defendants' argument regarding the compensability of damages would seem to apply equally to any potential harm suffered by Defendants and therefore not weigh in favor of either party.  As detailed above, however, the harm suffered by Liberty cannot be remedied solely by monetary damages.  Irrespective, by failing to comply with the post-termination provisions and requirements under the Franchise Agreements and interfering with Liberty's operations at the franchise locations, Defendants proceeded at their own peril.  The injunctive relief Liberty seeks will only enjoin Defendants from engaging in activities from which they are contractually barred.  "Generally, a franchisee that has breached the terms of its franchise agreement cannot then complain of harm from an injunction preventing further violations of the agreement."  *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014) (citations omitted).  Any alleged harm to Defendants is solely self-inflicted and cannot outweigh the irreparable harm they would cause to Liberty's franchise business and customer relationships. *See U.S. Lawns v. Landscape Concepts of CT, LLC*, Case No: 6:16-cv-929-Orl-41DAB, 2016 WL

9526340, at *9 (M.D. Fla. Oct. 31, 2016) ("While the Court acknowledges that Defendants will suffer substantial financial losses if a preliminary injunction issues, the resulting harm follows from Defendants' failure to abide by the Non–Competition Clause in the Franchise Agreement"); *see Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1297 (S.D. Fla. 2020) ("Before issuing an injunction, the Court must balance the relative hardship to each side. But the Court need not consider the 'hardship' to a defendant whose conduct is 'unlawful.'").

Comparing the harm suffered by the parties in this instance, the balance of harm tips in favor of Liberty.  Given the lack of harm to Defendants from enforcement of provisions they agreed to in a valid contract as compared to the significant harm to Liberty from not enforcing such provisions, Liberty showed that the threatened harm to it outweighs the harm a preliminary injunction may cause to Defendants.  As such, the balance of harm weighs in favor of entry of a preliminary injunction.  For that reason, a preliminary injunction should issue.

### D.    Public Interest

Finally, Liberty must demonstrate that the preliminary injunction would not disserve or be adverse to the public interest.  *Siegel*, 234 F.3d at 1176.  In a breach-of-contract case, the public interest involves the enforcement of valid contracts.  *See, Developers Sur. and Indemn. Co. v. Bi-Tech Const., Inc.*, 964 F. Supp. 2d 1304, 1310 (S.D. Fla. 2013).  According to Liberty, enforcement of the Franchise Agreements by enjoining Defendants from further breaching those agreements would not be adverse to the public interest.  Liberty asserts that entry of a preliminary injunction

would serve the public interest because Defendants contractually agreed to assign the leases to Liberty, return Liberty's confidential information, and not to compete against Liberty within the former franchise territories, so the requested injunctive relief will enforce a valid, binding agreement that is reasonable in scope and necessary to prevent irreparable harm to its franchise business. Indeed, "there is a benefit to the enforcement of a valid covenant not to compete and encouraging people to adhere to contractual obligations." *R.J. Gators Franchise Sys., Inc.*, 2005 WL 4655379, at *5 (citation omitted); *see also Abikarram*, 2019 WL 2254816, at *4 (recommending entering injunction and recognizing that protection of franchise-related rights is in the public interest), *report and recommendation adopted*, 2019 WL 11553446 (S.D. Fla. July 19, 2019); *Lee*, 514 F. Supp. 2d at 826 (stating that enforcement of legitimate non-compete obligations serves the public interest in preventing consumer confusion in granting a permanent injunction enforcing one of Liberty's franchise agreements).

Defendants contend, however, that entry of a preliminary injunction would prove adverse to the public interest because the request for injunctive relief came during the busy tax season, Liberty has engaged in a pattern of wrongful and inequitable conduct toward Gilbert, and Liberty has repeatedly engaged in similar strong-arm tactics with and hostile treatment of other franchisees. Defendants' arguments fail for several reasons. First, tax season ended on April 18, 2022, so the concern regarding any purported "frenzy" created by the issuance of an injunction in that regard has been rendered moot. As to the other two bases offered by

Defendants, the record contains competing interpretations and declarations regarding what transpired between the parties, with the evidence weighing in favor of Liberty's recitation of events. Most importantly, Defendants contractually agreed to assign the leases to Liberty, return Liberty's confidential information, and not to compete against Liberty within the former franchise territories. As Liberty contends, the public interest would be served by enforcing reasonable contract terms in the Franchise Agreements by enjoining Defendants from further breaching those agreements and by enforcing the provisions contained therein. Accordingly, the public-interest considerations weigh in favor of entry of a preliminary injunction.

### E.    Bond

A court may issue a preliminary injunction only if the movant provides security in an amount that the court considers appropriate to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. Fed. R. Civ. P. 65(c). Courts maintain discretion to issue a preliminary injunction without requiring the movant to provide security, however. *See BellSouth Telecomms., Inc.*, 425 F.3d at 971. Bond may be waived in certain circumstances, considering such factors as the possible loss to the enjoined party, the hardship that a bond would impose upon the applicant, and the impact of a bond on the enforcement of federal rights. *Johnston v. Tampa Sports Auth.*, No. 8:05CV2191T-27MAP, 2006 WL 2970431, at *1 (M.D. Fla. Oct. 16, 2006). Where the plaintiff has a high probability of success on the merits of its claim, and the defendant maintains no legitimate interest in continuing the prohibited conduct, a bond is

unwarranted.  *See TracFone Wireless, Inc. v. Washington*, 978 F. Supp. 2d 1225, 1235 (M.D. Fla. 2013).

Liberty asks that an injunction be issued without a bond or with only a nominal bond in the amount of $10,000 or less since Defendants will suffer little to no damage if an injunction issues.  Further, Liberty posits that, since Defendants agreed to waive the bond requirement in each of the Franchise Agreements (Doc. 15, Ex. A-F, § 10(h)), no bond should be required.  *See Silva*, 2020 WL 3266568, at *3 (requiring that no bond be posted in granting a temporary restraining order in favor of Liberty in an action to enforce a similar franchise agreement because the parties waived the bond requirement and because no significant financial constraints would be imposed by issuance of the temporary restraining order).  In stark contrast, Defendants ask that Liberty be required to post a bond in the amount of $1.5 million, which Gilbert estimates was the value of his businesses prior to the purported wrongful termination of the Franchise Agreements.  Given Defendants' explicit agreement to waive bond and the fact that any costs or damages likely sustained by Defendants result from their failure to abide by the provisions of the Franchise Agreements, Liberty should not be required to post any bond.

### IV.   Conclusion

As noted, a preliminary injunction is an extraordinary remedy to be used only when a moving party carries its burden as to the four prerequisites.  *See Four Seasons Hotels and Resorts, B.V.*, 320 F.3d at 1210.  Liberty carried that burden in this instance.  Accordingly, it is hereby

RECOMMENDED:

1.      Liberty's Amended Motion for Preliminary Injunction (Doc. 19) be GRANTED.

2.      Defendants be enjoined from continuing to breach the provisions contained in the Franchise Agreements and be directed to comply with such provisions, as follows:

        a.      Cease operations of the competing businesses at the identified franchise locations;

        b.      Assign the leases to Liberty at the identified franchise locations where Defendants operate competing businesses and refrain from interfering with Liberty's right to act as Defendants' lawful agent and attorney-in-fact for the purpose of taking necessary action to complete the assignment of the leases;

        c.      Cease causing or attempting to cause the locks to be changed at the identified franchise locations and/or removing Liberty property from any of those locations;

        d.      Provide Liberty with a key for any new locks installed by Defendants at Liberty's franchise locations;

        e.      Cease entering onto or otherwise interfering with the operation of Liberty's franchise locations, except for purposes of assisting with the assignment of leases or other post-termination obligations;

        f.      Cease using any of Liberty's confidential information; and

g.      To the extent not already done so, return all client lists and files, confidential information, and other property belonging to Liberty.

IT IS SO REPORTED in Tampa, Florida, this 12th day of May, 2022.

ANTHONY E. PORCELLI
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. § 636(b)(1)(C). A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1). **Should the parties wish to expedite the resolution of this matter, they may promptly file a joint notice of no objection.**

cc:     Hon. Charlene E. Honeywell
        Counsel of Record