## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JTH TAX, LLC d/b/a LIBERTY TAX
SERVICE,

      Plaintiff,

v.                                  Case No: 8:22-cv-625-CEH-AEP

STEPHEN A. GILBERT and G-QTS,
INC.,

      Defendants.
_____/

## O R D E R

     This cause comes before the Court upon the Report and Recommendation of Magistrate Judge Anthony E. Porcelli (Doc. 47).

     In this action, a franchisor moves for preliminary injunctive relief to avoid irreparable harm. The Court referred that motion to the Magistrate Judge, who issued a Report and Recommendation ("R&R"). In the R&R, the Magistrate Judge recommends that the Court grant Plaintiff JTH Tax, LLC d/b/a Liberty Tax Service's Amended Motion for Preliminary Injunction. All parties received a copy of the R&R and an opportunity to object. Defendants Stephen A. Gilbert and G-QTS Inc. object (Doc. 48), to which Liberty responds (Doc. 58). Gilbert and G-QTS reply (Doc. 62).

     Upon consideration of the R&R, the objections, Liberty's response, the reply, and the Court's independent examination of the file, the Court will adopt the R&R and overrule the objections.

# I.   BACKGROUND

Plaintiff JTH Tax, LLC, d/b/a Liberty Tax Service, serves as the franchisor of Liberty Tax Service income tax preparation service centers throughout the United States. Doc. 15 ¶14. Liberty has expended substantial time and money promoting and advertising the distinctive and well known Liberty Tax Service tax preparation system, which sells income tax preparation and filing services to the public under Liberty's trademarks. *Id.* at ¶15.

Defendant G-QTS Inc. entered into six franchise agreements with Liberty for territories located in Tampa, Florida, and St. Petersburg, Florida (Doc. 15, Ex. A-F). These six franchise agreements contain substantively identical rights and obligations. (Doc. 15, Ex. A-F).[1] Defendant Stephen A. Gilbert, as the individual signatory for G-QTS, personally agreed to "perform all the obligations in and relating to" the Franchise Agreements, "including, but not limited to, all obligations related to the covenants not to compete, covenants not to solicit, [and] confidentiality obligations . . . ." Doc. 15, Ex. A-F § 27. In relevant part, the Franchise Agreements provide:

> **6. OBLIGATIONS OF FRANCHISEE**
>
> . . .
>
> **w.  Laws and Regulations.**  You agree to comply with all federal, state and local laws, regulations, ordinances, and the

---

[1] The Magistrate Judge noted that the parties agreed that the provisions contained in the Franchise Agreements are identical or substantially identical. Doc. 47 at 3 n.2. No party objects now that the terms of the Franchise Agreements vary. As such, similar to the Magistrate Judge, the Court, in referring to a relevant section of the Franchise Agreements, will cite to the relevant provision of the Franchise Agreements as "Doc. 15, Ex. A-F § __." The Court will cite the provisions found in the Franchise Agreement attached as Exhibit A to the First Amended Verified Complaint.

like, and to be responsible for such compliance by all employees of the Franchised Business.

. . .

**xii.    PTIN.**   No person who prepares or supervises the preparation of federal tax returns at your Franchised Business shall be permitted to undertake such activities unless such person has an active PTIN. You must provide us with satisfactory documentation, in Liberty's determination, that all tax preparers and any person who supervises the preparation of federal tax returns has an active valid PTIN.

Doc. 15, Ex. A-F §§ 6(w), (xii).

Under the Franchise Agreements, G-QTS and Gilbert ("Defendants") acknowledged and agreed that "all of the obligations under this Agreement are material and essential obligations, that nonperformance of the obligations herein will adversely and substantially affect Liberty and the Liberty system and that Liberty's exercise of the rights and remedies herein are appropriate and reasonable." Doc. 15, Ex. A-F § 8. The Franchise Agreements also provided, in relevant part, that Liberty may terminate the Franchise Agreement without notice and the opportunity to cure if "you breach [§] 6(w)-(x) of this Agreement . . . ." Doc. 15, Ex. A-F § 8(b)(iii).

Liberty conducted an investigation and determined that G-QTS allowed one of its employees, Kesha Mooney, to prepare and file federal tax returns using Gilbert's own PTIN. Doc. 15 ¶38. When Liberty confronted Gilbert, he did not deny that Mooney had prepared and filed returns using his PTIN. *Id.* Liberty contends that shared use of PTINs violates federal law. *Id.* at ¶39. As such, Liberty sent a letter addressed to Defendants, which terminated all six Franchise Agreements, effective immediately, "pursuant to paragraphs 8.b(iii), 6(w) and 6(x)ii of the Franchise

Agreements." Doc. 15, Ex. K at 1. In the letter, Liberty explained that the termination resulted from the "multiple breaches of the Franchise Agreements," including "Liberty's determination that you and/or your employees have failed to comply with federal, state and local laws, regulations, and ordinances related to the Franchised Business, by allowing shared use of a PTIN for preparation of, or supervision of preparation of, federal tax returns." *Id.*

Relevant to the termination, the Franchise Agreements include certain post-termination covenants, two of which the Court examines. First, Defendants agreed, for a period of two years "following the termination, expiration, transfer or other disposition of the Franchised Business . . . not to directly or indirectly, for a fee or charge, prepare or electronically file income tax returns . . . within the Territory or within twenty-five (25) miles of the boundaries of the Territory . . . ." Doc. 15, Ex. A-F § 10(b). Second, Defendants agreed, for a period of two years "following the termination, transfer, or other disposition of the Franchised Business," that they would "not, within the Territory or within twenty-five (25) miles of the boundaries of the Territory, directly or indirectly solicit any person or entity served by any of [their] prior Liberty offices" in the last twelve months that they were a Liberty franchisee "for the purpose of offering such person or entity, for a fee or charge, income tax preparation, electronic filing of tax returns, or Financial Products . . . ." Doc. 15, Ex. A-F § 10(d). Defendants agreed that these provisions are "reasonable, valid, and not contrary to the public interest." Doc. 15, Ex. A-F § 10(h). They also agreed that Liberty was entitled to "a temporary restraining order, preliminary and/or permanent injunction for any

4

breach of duties under any of the non-monetary obligations of Sections 9 and 10." Doc. 15, Ex. A-F § 10(h).

On the same day as the termination, Defendants executed Lease Surrender Agreements with Liberty with respect to two franchise businesses in St. Petersburg, Florida, and two franchise businesses in Tampa, Florida.[2] Doc. 15 ¶41, Ex. G-J. In these Lease Surrender Agreements, Defendants agreed to surrender the leases, the premises, and all rights granted to them under the leases to Liberty, who agreed to accept the surrender and release them from the remaining term of the leases. Doc. 15, Ex. G-J § 1. Defendants also irrevocably granted full power and authority to Liberty "for the sole purpose of taking any necessary action to complete" certain transfers to Liberty, such as transferring all telephone numbers, email accounts, listings, and advertisements used in relation to the relevant business. Doc. 15, Ex. G-J § 2. Further, Defendants agreed in the Franchise Agreements to immediately assign to Liberty any interest that they had in any lease, sublease, or any other agreement related to the franchised business upon termination. Doc. 15, Ex. A § 9(f).

Since the termination of the Franchise Agreements and the execution of the Lease Surrender Agreements, Defendants have failed to execute the documents necessary to assign the leases to Liberty for the locations in the Lease Surrender Agreements. Doc. 15 ¶60. Instead, Defendants asserted that the Lease Surrender

---

[2] The Lease Surrender Agreements pertain to those franchise businesses located at: (1) 2156 34th Street S, Saint Petersburg, Florida 33711; (2) 3713 49th Street N, Saint Petersburg, Florida 33710; (3) 7075 W. Waters Ave., Tampa, Florida 33634; and (4) 13803 W. Hillsborough Ave., Tampa, Florida 33635. Doc. 15 ¶41, Ex. G-J.

Agreements were invalid, purported to rescind them, and demanded that Liberty return possession of the franchise locations. Doc. 15 ¶61, Ex. L. Through counsel, Defendants contacted the landlord for one of the St. Petersburg locations and requested that the landlord restore possession of the location to them and requested a copy of the key from the landlord. Doc. 15 ¶¶63–64, Ex. M.

Gilbert also brought a locksmith to the two St. Petersburg locations and changed the locks at both locations. Doc. 15 ¶47. While changing the locks, Gilbert communicated with potential Liberty customers, informing at least one potential customer that the Liberty location could not provide services "today." *Id.* at ¶48. The next day, counsel for Defendants informed Liberty's counsel that Defendants intended to continue offering tax preparation services out of the locations. Doc. 15 ¶48, Ex. N.

In changing the locks for one of the St. Petersburg locations, Gilbert did not provide Liberty employees at that location with a new key. Doc. 15 ¶49. As such, Liberty personnel cannot exit and reenter the premises. *Id.* At the other St. Petersburg location, although Gilbert initially provided Liberty employees at that location with a new key, he later told Liberty employees at that location to leave and demanded that the Liberty employees at that location return the key to him. *Id.* at ¶¶51–52. According to Liberty, Gilbert interfered with Liberty's ability to conduct business at these two locations during the recent busy tax season by changing the locks and removing Liberty's equipment. *Id.* at ¶53. Liberty also alleges that, at Gilbert's instruction, Mooney removed two printers from one of the St. Petersburg locations, even though the printers belong to Liberty under the Franchise Agreements. *Id.* at ¶¶44–46.

6

After Liberty initiated this action, Defendants removed Liberty signs at the two St. Petersburg locations and installed signs for "Fast Tax," a direct competitor of Liberty. Doc. 15 ¶¶3–4, 67–69. Now, they operate a competing tax preparation business at those locations. *Id.* at ¶69. Liberty alleges that this new conduct violates the covenant not to compete in § 10(b) of the Franchise Agreements. *Id.* Liberty also alleges that Defendants have absconded with client's files and other confidential information. *Id.* at ¶70.

In the First Amended Verified Complaint, Liberty brings eight claims against Defendants, including claims for breach of the Franchise Agreements (both equitable and monetary claims), common-law conversion, declaratory judgment, and violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq. Id.* at ¶¶72–132.

Liberty now seeks a preliminary injunction that: (1) enjoins Defendants from operating a tax preparation business at the former franchise locations until March 5, 2024; (2) enjoins Defendants from operating competing tax return preparation businesses within 25 miles of their Liberty franchise territories until March 5, 2024;[3] (3) orders Defendants to assign the leases for each of the franchise locations to Liberty and to refrain from interfering with Liberty's right to act as the lawful agency and attorney-in-fact for Defendants for the purpose of taking necessary action to complete

---

[3] Liberty does not seek to enjoin Gilbert from continuing to operate an office located at 7606 N. Nebraska Ave., Tampa, Florida 33804, because Liberty allowed him to operate that office outside of the Liberty system, even though it was within 25 miles of a Liberty franchise territory. Doc. 19 at 3 n.1.

assignment of the leases; (4) enjoins Defendants from causing, or attempting to cause, the changing of locks at any franchise location and/or removing property from any franchise location; (5) enjoins Defendants from using any of Liberty's confidential information; (6) enjoins Defendants from entering onto or otherwise interfering with the operation of Liberty's franchise locations; (7) orders Defendants to return all Liberty confidential information, including all Liberty client files; (8) orders Defendants to return Liberty's equipment, including printers and computers, and other property that was removed from Liberty's franchise locations; and (9) orders Defendants to provide Liberty with a key for any new locks that they installed at Liberty's franchise locations. Doc. 19 at 3–4.

## II.   LEGAL STANDARD

A district judge may designate a magistrate judge to submit findings of fact and recommendations for the district judge's disposition of a motion for injunctive relief. 28 U.S.C. § 636(b)(1)(A)–(B). A district judge may accept, reject, or modify the magistrate judge's findings or recommendations. *Id.* § 636(b)(1)(C). The parties may object to those proposed findings and recommendations within 14 days. *Id.* Where a party objects to the magistrate judge's proposed findings and recommendations, the district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*

## III.   ANALYSIS

Defendants raise several objections to the R&R. Doc. 48 at 5–28. As explained in more detail below, the Court will overrule Defendants' objections.

## A. The Magistrate Judge Correctly Interpreted the Relevant Laws and Regulations and Correctly Found that Gilbert Breached the Franchise Agreements

The Magistrate Judge found that Mooney's submission of the returns using Gilbert's PTIN violated federal law—and therefore violated the terms of the Franchise Agreements—and constituted the initial breach that directly led to the termination of the Franchise Agreements. Doc. 47 at 9, 22. Defendants argue that the MJ erred in finding that Gilbert breached the Franchised Agreements "based on the lack of a clear violation of federal law and the specific circumstances of Gilbert's case." Doc. 48 at 11. Not one of its arguments is persuasive.

Defendants argue that whether Mooney violated federal law is unclear. *Id.* at 7. They contend that although Liberty "blacklisted" Mooney from preparing tax returns for Liberty, they lacked the authority to take away her PTIN. *Id.* But the issue is whether Mooney used Gilbert's PTIN, not whether Liberty properly prevented Mooney from preparing tax returns for Liberty. Next, under 26 U.S.C. § 6109, when required by regulations, "[a]ny return or claim for refund prepared by a tax return preparer shall bear such identifying number for securing proper identification of such preparer, his employer, or both, as may be prescribed." 29 U.S.C. § 6109(a)(4). Defendants argue that the use of "or" suggests that either the preparer (Mooney) or the employer (Gilbert, according to Defendants) may place their PTIN on prepared tax returns, but not necessarily both.

But Defendants do not point to supporting authority interpreting the statute in this manner such that Mooney's use of Gilbert's PTIN complies with the statute. *See*

*United States v. Espinal*, No. 11-20418-CIV-MCALILEY, 2021 WL 3666323, at *4 (S.D. Fla. Aug. 18, 2021) ("Individuals who prepare but do not sign returns are known as 'ghost' preparers. Section 6109 of the Internal Revenue Code requires paid return preparers to identify themselves on the returns they prepare for customers by including their preparer tax identification number ('PTIN') on the return.").

Pointing to 26 C.F.R. § 1.6109-2(a)(1) and § 301.7701-15, they argue that Gilbert "had the primary responsibility for the accuracy of the tax returns filed by Mooney using his PTIN," even if he was not "primarily responsible for filling out the forms." Doc. 48 at 8. Under § 1.6109-2(a)(1), "each filed return of tax or claim for refund of tax under the Internal Revenue Code prepared by one or more tax return preparers must include the identifying number of the tax return preparer required by § 1.6695–1(b) to sign the return or claim for refund." 26 C.F.R. § 1.6109-2(a)(1). In turn, § 1.6695-1(b) discusses the "signing tax preparer," which is defined as "the individual tax return preparer who has the primary responsibility for the overall substantive accuracy for the preparation of such return or claim for refund." *Id.* §§ 1.6695-1, 301.7701-15(b)(1). Gilbert merely concludes, without pointing to any support in the record, that he had the primary responsibility for the accuracy of the tax returns that Mooney prepared. In addition to failing to point to any support for this proposition, he fails to explain why he held primary responsibility for the accuracy of the tax returns when Mooney prepared them. Indeed, he concedes that Mooney prepared returns using his PTIN. Doc. 30-2 at 6, 23–24; Doc. 38-1 at 2–3. Also, as the Magistrate Judge recognized, Doc. 47 at 6, "if there is an employment arrangement or association

10

between the individual tax return preparer and another person . . . the identifying number of the other person must *also* appear on the filed return or claim for refund," 26 C.F.R. § 1.6109-2(a)(1) (emphasis added).[4] Defendants do not address this provision. Again, Mooney prepared the returns using Gilbert's PTIN. As such, these arguments fail.

Defendants argue that Gilbert himself did not violate the PTIN regulations or laws, as Mooney is the individual who admitted to misusing Gilbert's PTIN on two returns. Doc. 48 at 7. But, as the Magistrate Judge recognized, Gilbert agreed to "comply with all federal, state and local laws, regulations, ordinances, and the like, and to be responsible for such compliance by all employees of the Franchised Business." Doc. 47 at 22 (internal quotation marks omitted) (quoting Doc. 15, Ex. A-F § 6(w)). Because Mooney, an employee of G-QTS, the franchisee, used Gilbert's PTIN in preparing returns, this argument fails.

Next, Defendants argue Mooney's conduct did not violate federal law because her "transgression" arose despite Gilbert's ordinary care and did not result from willful neglect.[5] Doc. 48 at 8. They assert that 26 C.F.R. § 1.6695-1(b) and (c) provide affirmative defenses when the failure to sign or furnish a PTIN resulted from

---

[4] A "tax return preparer" is defined as "any person who prepares for compensation, or who employs one or more persons to prepare for compensation, all or a substantial portion" of any tax return or claim for tax refund. 26 C.F.R. § 301.7701-15(a).

[5] They also contend that a "miniscule penalty" would result from Mooney's violation of the relevant PTIN-sharing laws. Doc. 48 at 8. But the recognition that a "miniscule penalty" would result from Mooney's violation does not mean that she did not violate federal law.

"reasonable cause and not due to willful neglect." *Id.* at 8–9. Pointing to identical language in 26 U.S.C. § 6695, Defendants similarly argued for these affirmative defenses before the Magistrate Judge. Doc. 30 at 14. The Magistrate Judge concluded that, even when considering Gilbert's explanation, the record indicates that he was, at worst, intentionally culpable for the illegal use of his PTIN or, at best, negligent in allowing Mooney access to the office and computer logged in with his PTIN. Doc. 47 at 9. Arguing that the Magistrate Judge erred in reaching this conclusion, they claim that Gilbert did not know of, or authorize, Mooney to use his PTIN, he took all the steps prescribed by Liberty's compliance department to ensure that Mooney could not prepare or file tax returns, and that he was not negligent simply because Mooney was in a position to surreptitiously use his PTIN. Doc. 48 at 8–9. The Magistrate Judge considered the statements in Gilbert's supplemental declaration to which Defendants now cite. Doc. 47 at 8–9. None of these arguments warrants departing from the Magistrate Judge's conclusion.[6] Defendants do not demonstrate that Mooney's use of Gilbert's PTIN resulted from reasonable cause and not due to willful neglect.

Finally, Defendants argue that the "reasoning behind enforcing 26 U.S.C. § 6109-2(a)(1) is not present in this case."[7] Doc. 48 at 9. In support, they argue that *Espinal* and an IRS news release indicate that the purpose of requiring PTINs under 26

---

[6] Relatedly, Defendants' argument that the PTIN regulations and laws do not permit criminal sanctions for negligence falls short. Doc. 48 at 10.

[7] Because "26 U.S.C. § 6109-2(a)(1)" does not exist and Defendants reference 26 U.S.C. § 6109 in the next sentence, the Court construes "26 U.S.C. § 6109-2(a)(1)" as referencing 26 U.S.C. § 6109.

U.S.C. § 6109 is "to prevent shady characters from earning a 'quick buck' by improperly filing tax returns and then escaping into the ether." *Id.* at 9–10. But neither source discusses the "purpose" of § 6109. Any reference to certain types of "ghost" preparers in those sources does not mean that Mooney did not violate the law. As such, this argument is unavailing.

Therefore, the Magistrate Judge correctly interpreted the relevant laws and regulations and correctly found that Gilbert initially breached the Franchise Agreements.

### B. The Magistrate Judge Correctly Found that Mooney's Use of Gilbert's PTIN Constituted a Material Breach

The Magistrate Judge found that Defendants' violations of federal law prohibiting shared use of a PTIN were material. Doc. 47 at 29. Defendants object that, even if the Franchise Agreements prohibit Gilbert's conduct, that conduct does not constitute a material breach of the Franchise Agreements. Doc. 48 at 11. They argue that the breach does not satisfy the five-factor material-breach test in *RW Power Partners, L.P. v. Virginia Electric & Power Company*, 899 F. Supp. 1490 (E.D. Va. 1995). *Id.* at 12–15. Defendants' analysis of these factors improperly replicates their argument before the Magistrate Judge. *See Burns v. Town of Palm Beach*, 343 F. Supp. 3d 1258, 1270 n.2 (S.D. Fla. 2018) ("It is improper for an objecting party to submit papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers to the Magistrate Judge.") (internal quotation marks and alterations omitted).

Defendants argue that the Magistrate Judge failed to conduct a materiality analysis under these factors. Doc. 48 at 14. But the Magistrate Judge recognized, and Defendants fail to mention, that Defendants acknowledged and agreed in § 8 of the Franchise Agreements that all of the obligations in the Agreement—thus, the obligation in § 6(w) to comply with federal, state, and local laws and regulations and to be responsible for all employees' compliance—"are material and essential obligations," that "nonperformance of the obligations herein will adversely and substantially affect Liberty," that "Liberty's exercise of the rights and remedies herein are appropriate and reasonable," and that Liberty may terminate the Franchise Agreement without notice and an opportunity to cure for breaching this material and essential obligation or for committing a material violation of any law, ordinance, rule, or regulation of a governmental agency or department reasonably associated with the operation of the Franchised Business. Although Defendants contend that the Magistrate Judge's conclusion contravenes *RW Power* and allows parties to "create their own law of materiality," they rely upon a case in which the relevant agreements did not include this language. As such, the Court will overrule these objections.

### C. The Magistrate Judge Properly Analyzed the Covenant Not to Compete

Defendants assert that the Magistrate Judge erroneously concluded that the reasonableness test for evaluating covenants not to compete includes only an inquiry into the covenant's duration and geographic scope, but not whether the covenant is

narrowly tailored or whether the covenantee has a protectible business interest. Doc. 48 at 17. The Court will overrule these objections.

As the Magistrate Judge recognized, Doc. 47 at 23–24, because Virginia disfavors restraints on trade, courts enforce non-competition agreements "if the contract is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy," *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005). "To be enforceable, the restraint must not be (1) more restrictive than necessary to protect a business interest; (2) 'unduly harsh or oppressive' in restricting one's ability to earn a livelihood; or (3) offensive to public policy." *JTH Tax, Inc. v. Frashier*, No. 2:09cv40, 2009 WL 10689306, at *3 (E.D. Va. Apr. 15, 2009) (citing *Modern Env't, Inc. v. Stinnett*, 561 S.E.2d 694 (Va. 2002)). The Magistrate Judge explained that courts evaluating these factors consider the function, geographic scope, and duration of the restriction. Doc. 47 at 24. Indeed, the Supreme Court of Virginia has repeatedly emphasized that courts evaluating the enforceability factors consider the function, geographic scope, and duration of the restriction. *E.g.*, *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012); *Home Paramount Pest Control Cos., Inc. v. Shaffer*, 718 S.E.2d 762, 764 (Va. 2011); *Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2001). As such, the Magistrate Judge examined these factors and determined that the post-termination obligations under the Franchise Agreements "are narrowly tailored in function, geographic scope, and duration and necessary to protect Liberty's goodwill and reputation." Doc. 47 at 25. Separately, the Magistrate Judge

also recognized that courts have repeatedly enforced Liberty's non-compete and other post-termination obligations as reasonable restraints of trade. *Id.* (collecting cases).

Thus, the Magistrate Judge properly analyzed whether the restraint is more restrictive than necessary to protect a business interest, whether it is unduly harsh or oppressive in restricting the ability to earn a living, and whether the restraint is offensive to public policy. Defendants' contention that the Magistrate Judge erred by failing to determine whether the covenant not to compete was narrowly tailored or whether the covenantee had a protectible business interest is unavailing.

Next, Defendants claim that the Magistrate erred in finding *Pitrek USA, LLC v. Wilcox*, No. 6:06-cv-566-GAP-KRS, 2006 WL 1722346 (M.D. Fla. June 21, 2006), inapplicable because the Court decided that action under Florida law, as opposed to Virginia law, including § 542.335, Florida Statutes, Doc. 48 at 18, which provides that "[a]ny restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." Fla. Stat. § 542.335(1)(b). In support, Defendants point to *Modern Environments, Inc v. Stinnett*, 561 S.E.2d 694 (Va. 2002), to argue that Virginia courts do not limit their review to considering whether the restrictive covenants are facially reasonable, but also examine the legitimate, protectable interests of the employer, the nature of the former and subsequent employment of the employee, whether the actions of the employee violated the terms of the non-compete agreements, and the nature of the restraint in light of the circumstances of the case. Doc. 48 at 18.

In *Modern Environments*, the employer argued that the lower court erred in holding that a covenant not to compete was over-broad and unenforceable because the Supreme Court of Virginia had previously enforced identical or similar language in other employment agreements. 561 S.E.2d at 695–96. The Supreme Court rejected this argument, explaining that, in those cases, it had considered "the legitimate, protectable interests of the employer, the nature of the former and subsequent employment of the employee, whether the actions of the employee actually violated the terms of the non-compete agreements, and the nature of the restraint in light of all the circumstances of the case." *Id.* at 697. In other words, the language was not valid or enforceable simply as a matter of law in all circumstances. *Id.* Consistent with the cases above, the court emphasized that determining whether to enforce a restraint of trade involves evaluating whether the restraint is no greater than necessary to protect a legitimate business interest, whether the restraint is not unduly harsh or oppressive in curtailing the employee's ability to earn a livelihood, and whether the restraint is reasonable in light of public policy. *Id.* at 695.

As explained above, the Magistrate Judge considered the necessary factors for that analysis. The Magistrate Judge extensively analyzed the specific circumstances of this case, including Liberty's protectable interest, Gilbert's employment, and whether Defendants violated the covenant not to compete.[8] *See* Doc. 47 at 23–32. In objecting,

---

[8] Defendants argue that the Magistrate Judge refused to consider whether the covenant not to compete is narrowly tailored to "Gilbert's situation" in light of his operation of a tax business before he purchased the Liberty franchises. Doc. 48 at 17–18. But Defendants argued before the Magistrate Judge that Gilbert operated his own tax business before purchasing the Liberty

Defendants contend that Liberty never provided "unique training and resources" or any trade secrets. Doc. 48 at 19–22. They argued the same points before the Magistrate Judge, in some instances with identical language. Doc. 30 at 25. The Magistrate Judge found these arguments unpersuasive and also highlighted that Liberty had adduced written proof that it provided Gilbert with training and an operations manual. Doc. 47 at 26–27. Asserting again that Liberty's arguments are conclusory and speculative, Defendants point to evidence that the Magistrate Judge considered to relitigate their arguments. Doc. 48 at 20–22. The Magistrate Judge found that the evidence weighed in favor of Liberty's recitation of events. Doc. 47 at 40. Because Defendants' arguments are unavailing, the Court will overrule these objections.

### D. Defendants' Waiver Argument Fails

Next, Defendants argue that the Court cannot find "Gilbert (and Fast Tax)" in violation of the covenant not to compete because that covenant does not cover "the three locations for Gilbert's independent Fast Tax locations that operated before he purchased his first Liberty franchise." Doc. 48 at 22. According to Defendants, "[a]ll three of these locations were exempted" from the covenant not to compete per "the agreement of the parties," as established by their conduct and oral agreements. *Id.*

Liberty argues that the Court should not consider this argument because Defendants did not present it to the Magistrate Judge. Doc. 58 at 13. "[A] district court

---

franchise. Doc. 30 at 25. Regardless, when considering the factors outlined above and the circumstances of this case, Gilbert's ownership of the tax business before purchasing the franchises does not upend the Magistrate Judge's well-reasoned conclusion.

has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge." *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009). In their reply, Defendants concede that they did not raise this argument before the Magistrate Judge. *See* Doc. 62 at 5 ("There is no law supporting that a district court should or must decline to hear new arguments in an objection, only that they may.") (original emphasis removed). Nonetheless, the Court will exercise its discretion and consider this argument.

In objecting to the R&R on this ground, Defendants point to Gilbert's supplemental declaration, Doc. 48 at 23–24, in which he states, among other things, that he disclosed his ownership of a Fast Tax enterprise in his initial franchise application, he continued his Fast Tax business within 25 miles of the Liberty franchise operations, that he gave assurances to Liberty personnel that he would be able to operate the Liberty franchises because his wife operated the Fast Tax business, and that he gave assurances to Liberty that he would not comingle the two tax businesses, Doc. 38-1 at 10–11. Defendants do not cite to, or apply, any legal authority in their objections.

As Liberty highlights in its response to the objections, Doc. 58 at 13, "[w]aiver is the voluntary, intentional abandonment of a known legal right." *Bergmueller v. Minnick*, 383 S.E.2d 722, 725 (Va. 1989). "It has two essential elements: (1) knowledge of the facts basic to the exercise of the right, and (2) the intent to relinquish that right." *Id.* "A waiver will not be implied if either element is lacking . . . ." *Id.* "Either a waiver must be express, or, if it is to be implied, it must be established by clear and convincing

evidence." *McMerit Constr. Co. v. Knightsbridge Dev. Co., Inc.*, 367 S.E.2d 512, 516 (Va. 1988). Liberty also points to a non-waiver clause in the Franchise Agreements, which states that the "failure of either party hereto to enforce any of the terms or conditions of this Agreement shall not be deemed a waiver of such terms or conditions or of either party's right thereafter to enforce each and every term and condition of this Agreement." Doc. 15-1, Ex. A-F § 17(a). Liberty also points to a modification clause, which states that "[n]o modifications to this Agreement will have any effect unless such modification is in writing and signed by you and by Liberty's authorized officer." Doc. 15-1, Ex. A-F § 19. And Liberty cites to an integration clause, which states that "[t]his Agreement is the entire agreement between you and Liberty. This Agreement supersedes all other prior oral and written agreements and understandings between you and Liberty with respect to the subject matter herein." Doc. 15-1, Ex. A-F § 22.

In their reply, Defendants argue that the declaration indicates that "there was an oral agreement to waive the non-compete clause as to Defendants' three Fast Tax locations he owned before purchasing his Liberty franchises." Doc. 62 at 5. Citing legal authority for the first time, they argue that a waiver may be implied under Virginia law. *Id.* And they contend that a waiver clause itself is not necessarily binding because a party's action may result in its waiver. *Id.* at 5–6.

Because Defendants cite to caselaw about implied waiver, the Court construes their argument as pursuing a theory of implied waiver. Thus, they must establish that implied waiver by clear and convincing evidence. But they fail to do so. Defendants do not present any argument for why they satisfy the two-part test for waiver under

Virginia law. At a minimum, Defendants do not demonstrate, by clear and convincing evidence, an intent to relinquish the right to enforce the covenant not to compete, which prevented Gilbert from directly or indirectly preparing or electronically filing income tax returns or offering financial products within the territory or within twenty-five miles of the territory for two years after termination, as the cited portions of Gilbert's declaration indicate only that he disclosed his ownership of Fast Tax to Liberty, that he assured Liberty personnel that he would not allow Fast Tax to interfere with the Liberty franchise, that he assured Liberty personnel that he would be able to focus his efforts on the Liberty franchise because his wife and the Fast Tax store manager would run the day-to-day operations of Fast Tax, and that he confirmed that his wife operated Fast Tax. Defendants do not present a cogent argument for overcoming the non-waiver clause; they argue only that the waiver clause is not necessarily binding because it may be waived. Similarly, despite seeking to introduce evidence of earlier oral agreements, Defendants do not address the integration clause or provide any argument for overcoming that clause. As such, the Court will overrule these objections.

### E. The Magistrate Judge Did Not Err in Finding that Liberty Met Its Burden of Proof

Finally, Defendants argue that Liberty failed to present sufficient facts to support any alleged irreparable harm that it would suffer if the Court did not grant its request for a preliminary injunction. Doc. 48 at 25. They contend that Liberty has offered the testimony of one regional director, Brian Panelo, whose testimony includes

bare allegations and speculation about the alleged harm. *Id.* at 26–27. Pointing again to Gilbert's testimony, they assert that Liberty has not provided any specific facts that Gilbert uses Liberty's trade secrets or information and that Liberty has failed to identify a single customer lost to Fast Tax. *Id.* at 27–28.

The Magistrate Judge correctly found that Defendants' continued breach of the covenant not to compete creates irreparable harm to Liberty because that continued breach presents Liberty with a high likelihood of permanent loss of former and potential customers. Doc. 47 at 33–34. The Magistrate Judge also correctly found that Defendants' failure to adhere to the post-termination obligations under the Franchise Agreements to assign the leases to Liberty, as well as their subsequent blocking of Liberty's access to the locations, constitutes irreparable harm. *Id.* at 35. Relevant here, Panelo states in his supplemental declaration that the goodwill and customer loyalty that Liberty established and maintained at its St. Petersburg locations since those locations opened ten years ago is damaged each day that Gilbert continues to operate a competing business at those locations, and Liberty is losing customer relationships and revenue each time a customer returns to those locations to have their taxes prepared. Doc. 37-1 at 10–11. The supplemental declaration also addresses Liberty's provision of training and the operations manual, as well as the removal of equipment. *Id.* at 9–10. Further, in the First Amended Verified Complaint, which Panelo verifies, Liberty alleges that it has suffered, and will continue to suffer, actual, substantial, and irreparable damages, such as loss of customer goodwill and loyalty, loss of business

relationships to provide tax preparation services and related services, and loss of customers and profits. Doc. 15 ¶81.

Contrary to Defendants' argument, Panelo's declaration is not full of bare allegations. Further, his declaration is more detailed than the relevant testimony in the two cases on which Defendants rely in objecting—cases they presented to the Magistrate Judge. Doc. 30 at 10–11, 20–21, 23–24. Although Defendants assert that Liberty has failed to identify one specific customer that Liberty has lost to Fast Tax, the failure to identify a specific customer does not demonstrate that the Magistrate Judge erred, given Liberty's evidence that Fast Tax now operates where Liberty previously operated. Nor is Liberty's evidence speculative. *See* Doc. 37-1 at 9–12. Finally, Defendants' reference to their earlier argument, along with Gilbert's accompanying testimony, that Liberty has failed to provide specific facts that Gilbert currently uses Liberty's trade secrets or confidential information is unavailing. As explained above, the Magistrate Judge rejected Defendants' argument that Liberty never provided any trade secrets or unique training and resources, stating that Liberty adduced written proof that it did. Defendants simply repeat their arguments; they do not demonstrate that the Magistrate Judge erred. Thus, the Court will overrule these objections.

## IV.   CONCLUSION

Accordingly, it is **ORDERED**:

1. Defendant Gilbert's Objections to Magistrate Report and Recommendation (Doc. 48) are **OVERRULED**.

2. The Report and Recommendation of Magistrate Judge Anthony E. Porcelli (Doc. 47) is **ADOPTED**, **CONFIRMED**, and **APPROVED** in all respects and is made a part of this order for all purposes, including appellate review.

3. Plaintiff's Amended Motion for Preliminary Injunction (Doc. 19) is **GRANTED**.

4. Defendant Stephen A. Gilbert and Defendant G-QTS Inc. are **ENJOINED** from continuing to breach the provisions contained in the Franchise Agreements and are directed to comply with such provisions, as follows:

   a. They must cease operations of the competing businesses at the identified franchise locations;

   b. They must assign the leases to Liberty at the identified franchise locations where Defendants operate competing businesses and refrain from interfering with Liberty's right to act as Defendants' lawful agent and attorney-in-fact for the purpose of taking necessary action to complete the assignment of the leases;

   c. They must cease causing, or attempting to cause, the locks to be changed at the identified franchise locations and/or removing Liberty's property from any of those locations;

   d. They must provide Liberty with a key for any new locks installed by Defendants at Liberty's franchise locations;

    e.  They must cease entering onto or otherwise interfering with the operation of Liberty's franchise locations, except for purposes of assisting with the assignment of leases or other post-termination obligations;

    f.  They must cease using any of Liberty's confidential information; and

    g.  To the extent not already done, they must return to Liberty all client lists and files, confidential information, and other property belonging to Liberty.

5.  In accordance with the Report and Recommendation and as set forth in the Franchise Agreements, Liberty is not required to post a bond.

**DONE AND ORDERED** in Tampa, Florida on August 4, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any